# EXHIBIT A
# (PART 1 OF 6)

**BEFORE FINRA DISPUTE RESOLUTION**

| | |
|---|---|
| *In the Matter of the Arbitration Between*<br><br>Susan Kraus,<br><br>                     Claimant,<br><br> -and-<br><br>Francis Financial Inc., Stacy Francis,<br>Charles Schwab & Co., Inc., and<br>J.P. Morgan Securities LLC.<br><br>               Respondents. | **STATEMENT OF CLAIM**<br><br><br>FINRA Case Number 24 -_____ |

Susan Kraus ("Claimant") (84 years old), individually and through her Power of Attorney (Leslie Clayton, her daughter), brings this arbitration for damages caused by the negligence, recklessness, breach of relevant state and federal laws, contracts, and fiduciary duties, including aiding and abetting breach of fiduciary duty, theft and conversion. Red flags of theft and conversion in accounts were improperly ignored and unreported by Francis Financial Inc. ("Francis Financial"), Stacy Francis, ("Ms. Francis"), Charles Schwab & Co., Inc. ("Schwab") and J.P. Morgan Securities LLC ("JPM") ("Respondents") as required by law.

Respondents permitted Ms. Kraus' oldest son, Brett Graham ("Mr. Graham"),[1] a formerly registered and <u>SEC-barred financial professional</u>, to perpetrate an open, notorious and identifiable theft scheme on his elderly mother in assisted living and suffering from cognitive issues. In just under 4 years, he depleted her life savings of ~ **$8,427,000** through 101 repeated and continuous large, round number, 5-figure and 6-figure withdrawals and transfers multiple times a month for years (not to mention reckless trading), clear red flags of elder financial exploitation. Ms. Kraus' unemployed industry barred son used the money to gamble, travel the world and live in luxury, while Ms. Francis watched on social media and conversed with his girlfriend.

This case is an egregious example of the complete neglect of a vulnerable senior widow and the complete failure in every required supervisory and compliance measure designed and used to protect seniors from elder financial abuse, a hot topic with every financial services-related regulator in America.

---

[1] Ms. Kraus has two other children, a middle-child, daughter Leslie Clayton and a youngest child, son Jed Graham. Jed will always be referred to as "Jed" not as Mr. Graham (Brett), to avoid confusion.

The accounts were opened and maintained without sufficient scrutiny or supervision and red flags at the opening and throughout could have prevented this situation at the very beginning and at many steps along the way. The RIA's conduct was abhorrent and the broker dealers' AML and Fraud Departments completely failed. Moreover, for the first ~$2 million stolen from 2019 to 2020, Mr. Graham did not have proper account authorization and should never have been able to transact at all. Once Mr. Graham's POAs were incredibly approved at the brokerage firms and RIA with clearly no meaningful due diligence or no heightened monitoring as would be required with the account of a vulnerable senior and SEC barred individual, ~$6+ million was stolen between 2021 to 2024 in a mandatory elder exploitation reporting state, which improperly failed to occur.

When the criminal authorities in New York and Florida, as well as the Federal Bureau of Investigation ("FBI"), were contacted by Ms. Kraus and her daughter, they took one look at the blatant theft and commenced investigations. The federal government swiftly commenced a formal investigation and visited Mr. Graham on September 5, 2024, in the process. There was no ambiguity in this wrongful conduct.

Elder financial exploitation (EFE) and anti-money laundering (AML) both relate to the misuse of financial resources for criminal or illicit purposes. EFE is when a family member, caregiver, or other individual illegally or improperly uses an elderly person's financial resources. AML is the process of preventing and detecting money laundering activities, which are when individuals or organizations try to hide the illegal origin of funds. Financial institutions have supervisory procedures and compliance tools to monitor for and prevent EFE, including the use of anti-money laundering and fraud monitoring software to create alerts to changes in client financial behavior, such as spikes in outgoing wire, ACH, or cash activity, as well as auditing software. (AML) is a critical framework within the financial industry, designed to detect, prevent, and report potentially illicit activities. The importance of AML cannot be overstated; it serves as the first line of defense (there are three lines) against financial crimes. AML is a mandatory compliance requirement for which financial institutions must adhere to keep operational licenses.

Respondents knew of the growing crisis in EFE and that more often than not it is perpetrated by a family member. Financial institutions and professionals abdicated their respective duties and allowed blatant theft without evidence of any effective compliance, supervisory and audit plans required.

## *I.*   **INDEX**

*I.*   INDEX .................................................................................................................................... 3

II.   EXPEDITED CASE STATUS REQUESTED & RIA AGREEMENT TO ARBITRATE ............... 5

III.   INTRODUCTION .................................................................................................................. 5

IV.   RELEVANT TIMELINE AND ACCOUNTS AT ISSUE: ....................................................... 9

V.   RELEVANT PARTIES AND NON-PARTIES ..................................................................... 13

   A.   Claimant Susan Kraus ...................................................................................................... 13

   B.   Respondent Francis Financial Inc. ................................................................................... 13

   C.   Respondent Ms. Francis of Francis Financial .................................................................. 14

   D.   Respondent Charles Schwab & Co, Inc. .......................................................................... 15

   E.   Respondent J.P. Morgan Securities LLC ......................................................................... 16

   F.   Relevant Third-Party JPM Branch ................................................................................... 17

   G.   Relevant Third-Party Brett Graham ................................................................................. 17

   H.   Relevant Third-Party Kevin Heredia ............................................................................... 18

   I.   Relevant Third-Party Registered Representatives of Francis Financial ............................ 18

VI.   STATEMENT OF FACTS AND SPECIFIC MISCONDUCT ............................................... 19

   J.   Ms. Kraus' Background, Expenses, and Change in Circumstances ................................... 19

      1.   Ms. Kraus' Background .............................................................................................. 19

      2.   Ms. Kraus' Intent and Will Before and After the Fraud ............................................. 20

      3.   Ms. Kraus' Change in Circumstances & Discovery of the Thefts............................... 21

      4.   Introduction to and Account with Francis Financial: Conflicts of Interest ................. 23

      5.   166 Acct Had Inappropriate Withdrawals & Investments: No Reason to Exist: Red Flags...... 24

      6.   Ms. Kraus' Power of Attorney Forms &  Related Affidavits ...................................... 27

      7.   Mr. Graham's Financial Exploitation and Related Red Flags ..................................... 32

   K.   The Conduct Was Contradictory to Francis Financial's Alleged Mission ......................... 39

   L.   Schwab and JPM Are Just as Liable Based on their Obligations ....................................... 40

   M.   Current Related Court Proceedings and Investigations Against Mr. Graham .................... 41

VII.   LEGAL ANALYSIS: ELDER FINANCIAL EXPLOITATION ............................................. 42

   A.   Introduction .................................................................................................................... 42

   B.   "Know Your Customer" & Elder Financial Exploitation .................................................. 45

      1.   Know Your Customer ................................................................................................ 45

      2.   Elder Financial Exploitation by a Family Member with a POA is a Known Risk .......... 49

   C.   Required Supervisory Procedures, Training & Tools: EFE Red Flags ............................... 53

      1.   Required Supervisory Plan, Training &  Escalation Procedures .................................. 53

      2.   Recognition of the Risks with Powers of Attorney & the Elderly............................... 54

      3.   Red Flags of Elder Financial Exploitation................................................................. 54

4.  EFE Conduct in Senior Safe Act, FINRA & SEC Rules, State & AML Laws Since 1970 ...... 59

D.  Another Shocking Issue With Respect To Schwab........................................................... 61

E.  Arbitrators Since the 1990s Held Firms Responsible for EFE ........................................ 63

VIII.  CAUSES OF ACTION ................................................................................................ 65

N.  NEGLIGENCE ............................................................................................................ 65

8.  Recklessness, Gross Negligence, and Ordinary Negligence ..................................... 65

9.  Negligent Failure to Supervise and Respondeat Superior ........................................ 66

O.  BREACH OF STATE &  FEDERAL LAWS .............................................................. 67

10.  Elder Financial Exploitation in Florida .................................................................. 67

11.  Florida Investor Protection Act, Florida Statute § 517.301 ..................................... 69

12.  New York Blue Sky Laws ...................................................................................... 70

13.  New York Civil Financial Exploitation .................................................................. 70

14.  Federal Laws, Rules & Guidance re: AML, Suspicious Transactions & Theft.......................... 71

P.  BREACH OF IMPLIED & ACTUAL CONTRACT ................................................... 72

Q.  BREACH OF FIDUCIARY DUTY ............................................................................ 74

R.  AID & ABET BREACH OF FIDUCIARY DUTY, FRAUD & CONVERSION: FAILURE TO ACT ............ 76

IX.  DAMAGES ................................................................................................................. 78

A.  COMPENSATORY & STATUTORY  DAMAGES ..................................................... 78

B.  PUNITIVE DAMAGES .............................................................................................. 79

C.  ATTORNEYS FEES ARE APPROPRIATE ................................................................ 79

1.  Florida Statute.......................................................................................................... 79

2.  New York ................................................................................................................. 79

D.  INTEREST IS APPROPRIATE .................................................................................. 80

1.  Florida Law .............................................................................................................. 80

2.  New York Law ......................................................................................................... 81

E.  FORUM COSTS AND EXPERT WITNESS FEES....................................................... 81

F.  DISCIPLINARY REFERRAL .................................................................................... 81

X.  Index for the Annexed Exhibits: ................................................................................... 83

## II.    EXPEDITED CASE STATUS REQUESTED & RIA AGREEMENT TO ARBITRATE

Claimant requests expedited case status for Susan Kraus, 84 years old and in assisted living because of cognitive issues.  Despite having had over $9 million liquid assets before this tragedy occurred, Ms. Kraus has been left with a frighteningly small amount of money to live on (some locked up in illiquid investments[2]).  At all relevant times, she was diagnosed with cognitive disorder that has advanced. She resides in California to be near her daughter and  requests an expedited arbitration because of her senior age and declining mental capacity.

Ms. Francis and Francis Financial are subject to FINRA arbitration via Schwab's Arbitration Agreement, described in Section 11 on page 8 of the Schwab Account Application, annexed as **Exhibit 1**. The Schwab Account Applications incorporated the Application Agreement, which  "contains a dispute arbitration provision." Additionally, Ms. Francis' and Francis Financial's agreement with Ms. Kraus also specified arbitration, at a location not specified.  See **Exhibit 13**. Further, Ms. Francis' Power of Attorney over Ms. Kraus' account also incorporated the Schwab Account Application, which required any disputes between the parties to be arbitrated at FINRA.  See **Exhibit 1**, second to last page.

## III.    INTRODUCTION

This case is about the elder financial exploitation of Ms. Kraus orchestrated by her eldest son Mr. Graham, a former financial services professional barred by the United States Securities and Exchange Commission (the "SEC") in 2015 for violating a key anti-fraud provision that makes it illegal to use deceptive or manipulative devices when buying or selling securities, Exchange Act Section 10(B)(5) and related rules.  He has since been unemployed, holding himself out as a "private investor."

When an account is opened, industry practice is to use a vendor (i.e., Lexis/Nexis) to perform automated Customer Identification ("CIP") and due diligence on account holders and authorized parties.  This would include negative news screening which should have alerted the firms to Mr.  Graham being barred.  The firm should have

---

[2] An additional $400,000 of Ms. Kraus' portfolio was located in Nuveen held in her IRA and illiquid private equity investments held at Strata Trust Company. Undeterred, after the scheme was discovered and control was transferred to Ms. Kraus' daughter, Mr. Graham still tried to get access to those funds, so aggressively that Ms. Kraus had to get an Order of Protection against him, which he was served with the week of September 16, 2024.

received an alert and taken action (i.e., rejected Brett as an authorized party, which they had every right to do, or put the account on heightened monitoring). This fraud may have then been prevented at the very beginning.

FinCEN Customer Due Diligence (CDD) Rule requires a Financial Institution ("FI") to develop a "customer risk profile" based on the nature and purpose of the relationship, "conducting ongoing monitoring to identify and report suspicious activity" and on a risk basis "maintain and update customer information."

For an elderly client, the risk profile should have been elevated (e.g., High Risk) and therefore subject to enhanced monitoring.  For example, a third-party wire transfer would be blocked under enhanced monitoring until specific approval is provided by the Compliance Department.

Mr. Graham was permitted to steal his mother's life savings without a proper power of attorney and/or authorization from Respondents' platforms: a brokerage firm, a registered investment advisor/firm and a private client account at a bank/brokerage firm with her legacy Series 6, 63, and SIE licensed professional involved.

Mr. Graham took ~ $2+ million with no authorization or power of attorney on Ms. Kraus' accounts. While there will be discussion about FINRA's guidelines from which to measure negligence and breach of fiduciary duty as well as overlapping federal, banking and securities laws, make no mistake, in the State of Florida where ~$6.8 million went out the door there is _mandatory_ elder financial exploitation reporting. Each Respondent failed to adhere to mandates and policies around contacting a trusted contact person **not** involved in the fraud, despite knowing other family members existed. No report was made nor trusted contact person contacted before the account was depleted.  Respondents' clearly insufficient and fragmented supervisory systems failed to properly implement and execute their duties under the mandatory reporting statute and failed to effectively supervise and insure compliance with the rules and laws intended to stop bad conduct before it happens in senior accounts.

Ms. Kraus was set for life by her spouse's and her own hard work.  She  should have had no problem paying her assisted living facility for the rest of her life – and then some, but Mr. Graham's  misdeeds were only discovered by the family when Ms. Kraus was essentially forced to leave her senior independent living home for his **_failure to pay her monthly assisted living fees after her son looted her money_**.

Mr. Graham used his mother's money to circle the globe with his girlfriend, withdrawing hundreds of thousands of dollars at a time[3] – **a clear red flag** – which the financial institutions knew, but the family (other than Mr. Graham) did not. He always acted, even after being barred, as a savvy investor and wealthy person. However, upon information and belief, he was in foreign jurisdictions when transacting in the 166 account and obtaining wires, clear red flags to the Respondents that required heightened review. If Mr. Graham was signing on from offshore locations,[4] alerts would have been (or should have been) generated for review. These alerts are generally reviewed by the Fraud Department. If Mr. Graham was wiring funds offshore, alerts also would have been (or should have been) generated for review. These alerts are generally reviewed by both the AML Department and the Fraud Department.

The accounts were opened on insufficient information and without proper due diligence; the accounts were not maintained as high risk accounts – but should have been given Ms. Kraus' age and Mr. Graham's status as a barred individual. Evidence will show that the mere fact that this activity was allowed to continue over such a long period despite the multiple red flags is indicative of incredibly flawed, fragmented and inadequate Fraud Management and AML programs. Regulatory bodies, including FINRA, SEC, FinCEN have indicated that successful AML Programs require at least three levels of defense, as will be discussed below.

---

[3] Multiple times a month for almost 4 years, in 101 transactions, Mr. Graham withdrew large sums of money from individual and IRA accounts and transferred them to Ms. Kraus' personal account at JPM (which was not in the same account name as the largest trust account) ultimately transferring them out to his own personal account at First Republic. Annexed as **Exhibit 17** is a chart and schedule of the transactions, including:

71 transactions of $100,000 exactly
1 transaction of $90,000 exactly
1 transaction of $80,000 exactly
1 transaction of $60,000 exactly
16 transactions of $50,000 exactly
1 transaction of $45,000 exactly
3 transactions of $40,000 exactly
1 transaction of $35,000 exactly
3 transactions of $25,000 exactly
1 transaction of $15,000 exactly
1 transaction of $4,000 exactly
<u>1 transaction of $3,000 exactly</u>
101 Transactions Total $8,427,000

[4] Although more discovery is required, it appears that transfers were requested in this scheme when Mr. Graham was in Jamaica, Kenya, St. Barts, St. Tropez, France, and Italy. Ms. Kraus never received paper statements or had the acumen to sign in online.

Not a single financial professional or firm attempted to contact a trusted contact person ("TCP") other than Mr. Graham, nor any local authorities. This is the least a fiduciary could do, as well as permissible in New York and mandatory in Florida.[5] Moreover, contacting a TCP is _required_ by all of the institutions through SEC and FINRA mandates incorporated into their supervisory procedures and the industry standards that employees must be trained to follow, as it would be negligent not to do so.[6]  On a monthly basis, hundreds of thousands of dollars in round numbers was leaving the account of an elderly woman with diminished capacity in assisted living. Know your customer requirements were completely ignored, as were EFE and AML requirements.

The institutions and individuals charged with supervision and compliance also knew and/or should have known that Mr. Graham lacked a POA or authorization for the initial $2 million stolen and then abused his powers under the POA that was negligently accepted.  It was clear that he did not act only in the best interest of Ms. Kraus and for her benefit, but no one even asked a question or investigated in dereliction of their duties.

Ms. Francis was a fiduciary with the highest standard of care during the relevant time period, **touted herself as specializing in assisting widows**, yet shamefully failed to protect her vulnerable senior widow client.

Ms. Kraus and her other family members reported these events to more than one criminal authority and investigations against Mr. Graham swiftly ensued by the NY District Attorney, FBI and others.  This resulted in his being visited and questioned by the FBI on September 5, 2024, as part of their ongoing and open formal investigation. Respondents assisted Mr. Graham in his criminal activities by failing to follow elder financial exploitation reporting and anti-money laundering ("AML") mandates.

---

[5] Florida Statute 415.1034[5] is a statute adopting the North American Securities Administrators Association's ("NASAA") _Model Act to Prevent Vulnerable Adults from Financial Exploitation_ "**_requiring_** securities dealers, investment advisors, and associated persons to immediately report knowledge or suspicion of abuse, neglect, or exploitation of vulnerable adults…."

[6] The financial institutions' supervisory and compliance procedures, as well as training materials, advise financial professionals how and when to report, which procedures are incorporated into client agreements and applicable negligence and other relevant common law standards.

IV.     **RELEVANT TIMELINE AND ACCOUNTS AT ISSUE:**

- *November 2018* – Ms. Kraus opened accounts at Schwab/Francis Financial:

    > **166** – personal brokerage account;
    >
    > **364** – individual brokerage account;
    >
    > 474 – IRA rollover;
    >
    > 299 – IRA rollover; and
    >
    > 505– brokerage account from the "Estate of David Kraus."[7]

- *2018 through December 21, 2020* –Mr. Graham continuously withdrew funds from Ms. Kraus' accounts <u>WITHOUT a valid POA over her accounts</u>, while residing in both New York and Florida – $2,525,000 was withdrawn & transferred to Mr. Graham in this period.

    - *2018 through June 2020* – Mr. Graham resided **in New York.** **$1,575,000** withdrawn & transferred to Mr. Graham without authorization or power in a permissive reporting state, but where firms require reporting in their policies and procedures.

    - *July 2020 through December 21, 2020*[8] – Mr. Graham resided **in Florida.** **$950,000** withdrawn & transferred to Mr. Graham without authorization or power in a mandatory reporting state.

- *July 2020* – <u>Mr. Graham moved to Florida;</u>   Florida is a **mandatory elder financial fraud reporting state.**

- *November 2020* – Mr. Graham executed the Durable POA attestation for Ms. Kraus, in Florida

- *December 2020* – Schwab POA was executed,  listing Francis Financial as  POA with Trading Authority and Mr. Graham as Durable POA

    - $6,852,000 withdrawn & transferred to Mr. Graham **in Florida** where mandatory elder financial exploitation reporting existed.

        - $950,000 (as stated above, before the power was executed)
        - $5,902,000 (after a power of attorney was accepted, although should not have been if anyone had reviewed the account history and Mr. Graham's background, as well as made a reasonable inquiry as to what was happening in the account).

---

[7] In or around February 2019, The Estate of David Kraus account was transferred into the main account ending in **364**.

[8] NOTE: In this period, in October 2020, Ms. Francis wrote an Op-Ed piece for CNBC with her Director of Financial Planning and Investment Management, Avani Ramnani, and the piece states:

> *Op-Ed: Investors Need to Know Exactly What Beling a "Fiduciary" Advisor Means*
>
> "From my perspective, if you claim to provide financial advice to a client, you are obligated to act on the client's behalf," said Avani Ramnani, a CFP and director of financial planning and investment management at Francis Financial. "If you fail to protect your client's rights, don't call yourself an advisor or financial planner."
>
> Another aspect of a fiduciary's duty is to act in good faith and provide all relevant facts to clients. Part of this duty is to educate your clientele.
>
> —By Stacy Francis, CFP, president and CEO of Francis Financial

*See* **Exhibit 16**. Available at: https://www.cnbc.com/2020/10/28/op-ed-investors-need-to-know-what-being-a-fiduciary-advisor-means.html.

The following were JPM accounts for Ms. Kraus at issue:

- 317 – private client primary checking account, opened in 2011;
- 750 – private client savings account, opened in 2011; and
- 409 – private client primary checking account, opened on or around September 26, 2011,  by Ms. Kraus' husband that passed away in 2017, it was a legacy account for decades;
    - The JPM account which these ensued from (ending 5012) was established in 1982.

- **_January 2021_** – **First JPM affidavit of POA** for Mr. Graham, notarized.
    - $2,625,000 withdrawn & transferred to Mr. Graham before JPM POA forms complete.
    - $5,802,000 withdrawn & transferred to Mr. Graham after JPM POA forms complete.

The shocking activity that occurred over this long timeframe despite the multiple red flags evidences inadequate Fraud Management and AML programs, i.e., a failure in the firms supervisory and compliance systems. FINRA, SEC, FinCEN (and others) indicate that successful AML Programs require **_at least_** three levels of defense.  Broadly speaking the three-lines requirements are:

**First Line:**

This line includes front office employees who deal directly with customers and back-office staff who deal with transaction processing.  This line is responsible for identifying, assessing, and controlling risks.  It is apparent in this situation, that the FIs failed to practice adequate controls.  Specifically, there should have been controls including:

- Third party payments review and approval at the time of the request by supervisory personnel familiar with the client.  This review would be conducted by persons familiar with the red flags associated with Elder Financial Exploitation ("EFE").
- Supervisory review of  Suitability and  KYC
- Unauthorized Account Control
- Account access approvals

**Second Line:**

This line includes the compliance functions and technology.  This line is responsible for identifying emerging risks and developing systems to deal with them. It is apparent in this situation, that the FIs failed to practice adequate controls.  Specifically, there should have been surveillance covering :

- AML: Third Party Payments review reports
- AML:  Offshore Funds Movement reports
- AML:  Rapid Movement (funds moving in/out in short period) of Funds reports

- AML: Change in Account Behavior reports
- AML: Round Dollar Funds Movement Reports
- Fraud: IP Address Mismatch Reports
- Fraud: Change in Account Authorization
- Fraud: Signature Violations
- Branch Compliance:  Suitability
- Branch Compliance:  Churning
- Branch Compliance:  Unauthorized Trading
- Branch Compliance: EFE Reports

Moreover, standard industry practice is for AML Compliance to conduct "Holistic Reviews" of client activity.  This typically involves coordinating with relevant  business areas to identify clients that may have been the subject to red flags that individually did not raise a concern, but collectively present a troubling trend or pattern of activity that requires a holistic review.

**Third Line**:

This line includes the internal audit function, which independently reviews the activities of the first two lines.  This line is responsible for assessing how effectively the first and second lines are working. It is apparent in this situation, that the FIs failed to control gaps related to the failure of the first two lines to share concerns on a timely basis that would have limited or prevented the loss damages.

Respondents Francis Financial, Schwab, and JPM failed to communicate with one another, despite being allowed and encouraged by authorities to be incorporated into a reasonable supervisory system to root out elder financial exploitation under relevant statutes, and guidelines, as well as by the Bank Secrecy Act.  Failure to utilize the protections afforded by Section 314(b) of the USA PATRIOT Act is major issue, especially when real-time fraud is present and requires immediate attention.

While AML Personnel are typically aware of ability to share information, there is often a lack of awareness on the part of other areas of the firm.  Specifically, Fraud Operations, Call Centers and Branch Management/Personnel. Moreover, firms often fail to act timely and/or share information across internal departments (likely due to inadequate staffing and/or high employee turnover). These failures permitted the fraudulent scheme to flourish.  (See Section V.A., *infra*, Re: "information sharing" between FIs to combat EFE.)

11

Mr. Graham converted his mother's wealth to his sole benefit, transferring funds from Ms. Kraus' accounts at Schwab/Francis Financial, to her accounts at JPM and then out to his personal First Republic account as easily illustrated by the below demonstrative exhibit created from account statements (which Respondents could have done) at the respective firms:



See **Exhibit 17**. "BG #######4150" is Mr. Graham's account at First Republic. JP Morgan's Transfer Agreement indicates that an "External Account" for transfers or linking "must be in the same individual or business entity of the account holder of the deposit account…." This is known as "same name transfers, which these were not. They were never requested by Ms. Kraus, online or otherwise.

## V.    RELEVANT PARTIES AND NON-PARTIES

### A.    Claimant Susan Kraus

Susan Kraus is an 84-year-old widow who has spent most of her life in New York City and devoted much of that time volunteering in the theater industry, while married to her late husband David Kraus who passed away in 2017. Ms. Kraus has three children, Brett Graham, Leslie Clayton, and Jed Graham.

Ms. Kraus was raised with humble beginnings in Brooklyn. She always devoted her life to her children. Specifically, when she had money, she used it frugally and wanted to ensure that her children would have a financial cushion upon her passing. As will be discussed *infra*, her **original will**, dated October 18, 2007, indicated that she wished for her estate to pass down in equal shares to **all three** adult children, Leslie Graham Clayton, Jed Graham and Brett Graham. The will has been revised and Brett Graham was removed.

### B.    Respondent Francis Financial Inc.

Respondent Francis Financial (CRD # 128067/SEC # 801-76703) is an SEC registered, Registered Investment Adviser ("RIA") located at 39 Broadway, Suite 1730, New York, NY 10006.[9] It cites working with women and "widowhood" long-term financial goals:

> Francis Financial delivers comprehensive wealth management services to individuals and families in New York and nationwide. **We specialize in working with women going through significant life transitions, such as widowhood** or coming into sudden wealth, and also work with all those wishing to establish long-term financial stability. With our PLAN-GROW-PROTECT process, you are guaranteed wealth management that's transparent and customized to your goals, while establishing and maintaining a robust financial portfolio.

(Emphasis added). Ms. Francis boasts that:

> Our team of Certified Financial Planner $^{TM}$ and Certified Private Wealth Advisor® professionals take a holistic approach to understand your financial situation, so that we can craft a plan and tailor your investment strategy in a way that puts you on a secure path towards **long-term financial stability**. Our strategy is transparent and focuses on growing your wealth. **We systematically evaluate and reassess your financial situation based on your values, goals and life changes, and then proactively take measures to protect your nest egg**.

---

[9] *Available at*: https://adviserinfo.sec.gov/firm/summary/128067.

(Emphasis added). Nothing could be further from the truth in the case of Ms. Kraus' account. Ms. Francis even offers "widow planning":

> During your initial meeting with our team of Certified Financial Planners™ and Certified Trust and Estate Specialists™, we will address any questions you may have regarding **financial planning after the loss of a spouse**. Additionally, we will listen to and address your concerns, ensuring that your wishes are heard as you embark on this new chapter of your life. To learn more about our company, we invite you to watch our video.

(Emphasis added).  Despite all this alleged dedication to women, Francis Financial permitted Mr. Graham to pilfer over $8 million in less than 4 years from a widow's account, while Ms. Francis and Francis Financial remained silent, and collected fees.

At the inception and throughout the maintenance of Mr. Kraus' accounts at Francis Financial, Ms. Kraus was a willing and able person, with mild memory issues (now more advanced), who could have been contacted about what was happening in the account, but never was contacted.  She also could have provided other family contacts or NYS Adult Protective Services (or the Florida counterpart), but that too never happened. In fact, Francis Financial, in face of the over $8 million being stolen from the account, chose to ***accept the thief's admonishment only to contact him and not Ms. Kraus*** about her account, as she advised Leslie. If Ms. Francis had contacted Ms. Kraus, she could have learned for herself about her client's abilities, children, wished, expectations, history, tolerance and objective, but Ms. Francis, *talks the talk*, but *does not walk the*

  

https://francisfinancial.com/ (Last visited August 21, 2024).

## C.  Respondent Ms. Francis of Francis Financial

Ms. Francis ("Ms. Francis") (CRD # 2939253) is an Investment Adviser registered with the SEC, and the Founder of Respondent Francis Financial.[10] According to her Investment Adviser Public Disclosure, Ms.

---

[10] *Available at*: https://adviserinfo.sec.gov/individual/summary/2939253.

Francis's Investment Adviser license was active during three different periods: (1) from Sept. 14, 2009, through December 31, 2012; (2) March 17, 2014, through December 31, 2016; and (3) July 6, 2021 through the present.

Ms. Francis touts the following on the firm's website https://francisfinancial.com/:

> Early in my childhood, I witnessed how devastating life could be for women who were not empowered through financial education. My grandmother, Myra, stayed in an abusive marriage because she did not have the skills to effectively deal with money. That experience changed my life and drove me to a career in finance.

Unfortunately, Ms. Francis did not live by her purported principles to protect Ms. Kraus, an elderly woman and widow, from elder financial exploitation by her son.

Both Ms. Francis and Francis Financial are subject to FINRA arbitration by way of paragraph 11 within the Schwab Account Applications (*see* **Exhibit 1**) signed by both, stating:

> By signing this Application, you acknowledge that you have received and read a copy of the attached Application Agreement, which contains a predispute arbitration provision. You acknowledge that your signature signifies and constitutes your agreement that this account and your relationship with Schwab will be governed by the Application Agreement and all incorporated agreements and disclosures, including, but not limited to, the Schwab One Account Agreement….

The Schwab Account Applications incorporate the Application Agreement which "contains a dispute arbitration provision." Additionally, the Schwab Account Applications, signed by Ms. Kraus and governing her financial relationship with Ms. Francis, Francis Financial and Schwab, incorporate the Schwab One Account Agreement, which requires arbitration in the FINRA forum.[11]

## D. **Respondent Charles Schwab & Co, Inc.**

Respondent Charles Schwab & Co, Inc. ("Schwab") (CRD #5393/SEC # 801-29938) is a FINRA registered broker-dealer and an SEC registered RIA with its main office at 3000 Schwab Way, Westlake, Texas. Per CRD, Schwab has at least 299 disclosures overall, 57 regulatory events, 3 civil events, and 237 arbitrations.

Schwab acts as a brokerage firm for many investment advisory firms and has advanced technological capability and tools to root out elder financial exploitation but did not do so. Schwab also violated FINRA Rules

---

[11] The Schwab One Account Agreement is publicly *available at*: https://www.schwab.com/resource/schwab-one-account-agreement. *See* paragraph 26, on pages 39-40/78. (Last visited August 1, 2024).

2268 and 2010 prohibiting a brokerage firm from including indemnification clauses _for its own conduct_ by inserting in its customer agreement a pre-indemnification clause to protect itself for failing to execute _the mandatory reporting required_ in mandatory reporting states, in this case under Florida as will be discussed below.

### E.  **Respondent J.P. Morgan Securities LLC**

Respondent J.P. Morgan Securities LLC ("JPM") (CRD # 79) is a FINRA registered broker-dealer with its main office at 383 Madison Avenue, New York, NY. Per its CRD, JPM has been the subject of at least 516 disclosures overall, 364 regulatory events and 143 arbitrations.[12] Ms. Kraus and her husband had a decades–long relationship with JPM since 1982 that during the relevant time period was at the private bank that included a FINRA registered representative on her team.  The conduct herein was known not to follow her usual patterns.

JPM proudly touts its investment-related work at the Private Bank on its website, which should not only be considered limited to reviewing client accounts for selling investment products to clients to make commissions, but also monitoring the accounts pursuant to AML, EFE and other issues required by the SEC, FINRA and the states where the account is maintained, transacted in and held:



---

[12] _See_ BrokerCheck for JPM (CRD # 79) (last visited March 19, 2024) https://brokercheck.finra.org/firm/summary/79.

## F.  Relevant Third-Party JPM Branch

The relevant Third-Party JPM branch ("Madison Branch") is located at 1025 Madison Avenue, New York, NY 10075,[13] which served Ms. Kraus and her late husband for over three decades. The transactions, a gross departure from their decades of business, were a red flag.

## G.  Relevant Third-Party Brett Graham

Brett Graham ("Mr. Graham" or the "POA at Issue") is Ms. Kraus' son who has an open investigation with the FBI/US Attorney based on her complaint for the conduct referenced herein about which he was questioned on September 5, 2024.[14] Mr. Graham was a previously registered broker. On February 19, 2015, the SEC permanently barred Mr. Graham from the securities industry for fraud  and ordered him to pay disgorgement, prejudgment interest and a civil money penalty  to the Securities and Exchange Commission."[15]  Ms. Francis, Schwab, and JPM had an obligation to know this fact in knowing its customer and assess both the risks and monitoring required.[16]  The account and his actions should have received heightened monitoring. Upon information and belief, he has been unemployed since he was barred that time and holds himself out as a "private investor."

---

[13] *Available at*: https://locator.chase.com/ny/new-york/1025-madison-ave.

[14] Upon information and belief, Mr. Graham moved to his Florida home (located at 1000 Biscayne Blvd Unit 2002, Miami, FL 33132) on or around July 1, 2020. Although, it is believed that he was intending to move from New York to Florida prior to this date.

[15]  Relevant SEC releases are available at  https://www.sec.gov/files/litigation/opinions/2018/34-84106.pdf  and https://www.sec.gov/files/litigation/admin/2015/34-74305.pdf. He unsuccessfully challenged the bar.

[16]

> 1. Risk-Based Approach: AML frameworks often advocate for a risk-based approach, where the level of due diligence and monitoring is commensurate with the level of risk posed by a customer or transaction. For example, a high-net-worth individual involved in international business may require enhanced due diligence compared to a local small business owner.

> From the perspective of a financial institution, risk assessment is a multi-faceted endeavor. It begins with customer due diligence—understanding who the customers are, the nature of their businesses, and the risks they potentially bring.

> 2. Ongoing Monitoring: Beyond the initial checks, ongoing monitoring is crucial for detecting suspicious activities over time. This involves regular review of transactions to ensure they are consistent with the institution's knowledge of the customer, their business, and risk profile. An example of this would be a customer who typically makes small, infrequent transactions suddenly starts making large, regular transfers without a clear explanation.

https://www.fastercapital.com/content/AML--Anti-Money-Laundering---Navigating-the-Waters-of-Compliance--AML-Strategies-in-the-KYC-Process.html

The Kraus/Graham family has filed numerous criminal and state protective actions against their son/sibling Mr. Graham, apparently now unable to pay his own rent or bills. Allegedly he has threatened leaving the country (to the south of France) and/or bankruptcy.  Mr. Graham's girlfriend was a friend of Stacy Francis and apparently had accounts with Ms. Francis. During the relevant period, Mr. Graham lived both in New York, NY, and Miami, FL. Mr. Graham moved from New York to Florida on or around July 1, 2020.

**H.  Relevant Third-Party Kevin Heredia**

Mr. Heredia was a FINRA Series 6, 63, and SIE  licensed professional at J.P. Morgan assigned to Ms. Kraus' accounts.  Mr. Graham transferred $7 million of the sale proceeds to the 364 Schwab/Francis Financial account and $950,000 to the 166 account, which appears to have been set up for his use and was the account he primarily utilized to transfer funds out of Schwab/Francis Financial to JPM from 2019 to 2020. By late 2020, Mr. Graham virtually depleted the 166 account and moved into utilizing the 364 account as the main account for unauthorized transfers through JPM to First Republic.

Mr. Heredia had the obligations of any financial professional with Ms. Kraus' accounts. More importantly, though, Mr. Heredia was Ms. Kraus' FINRA licensed private banker for at least four years and dealt directly with her whenever she visited the branch.[17]  He should have known that something was amiss, as Ms. Kraus was always a conservative person, did not spend a lot of money and would not have approved of Mr. Graham's withdrawals.

**I.  Relevant Third-Party Registered Representatives of Francis Financial**

Paul Stagis (CRD # 7393691)[18] and Peter Vilim (CRD # 7405544)[19] were SEC licensed professionals at Francis Financial associated with Ms. Kraus' accounts. Mr. Stagias appears on the Schwab One application forms dated **2018** as a Francis Financial representative. However, he was only registered as an investment adviser from

---

[17] Prior to Mr. Heredia becoming Ms. Kraus' primary private banker, a JPM employee by the name of "Deana" was Ms. Kraus' private banker. Upon information and belief, Deana and Mr. Heredia worked together in the same JPM branch that Ms. Kraus and her late husband Mr. Kraus visited to manage their accounts for over 30 years.

[18] https://adviserinfo.sec.gov/individual/summary/7393691.

[19] https://adviserinfo.sec.gov/individual/summary/7405544.

July **2021** through February 2022. Mr. Vilim appears on the Schwab POA form dated **2020** as a Francis Financial representative. However, he was only registered as an investment adviser from July **2021** through January 2024.

## VI.    STATEMENT OF FACTS AND SPECIFIC MISCONDUCT

### J.    Ms. Kraus' Background, Expenses, and Change in Circumstances

1.    Ms. Kraus' Background

Ms. Kraus, now 84 years old, was married to her late husband, David Kraus, for 36 years. Ms. Kraus had three children, Brett Graham, Leslie Clayton ("Leslie"), and Jed Graham ("Jed"). The Krauses lived in the Upper East Side in New York City for 34 years. For work, Ms. Kraus was a Public Relations Director at Macy's and worked for Theatreworks in New York City. In the past thirty years, Ms. Kraus has also been on the board for and has helped fundraise for Theatreworks, New Dramatists, and New York City Central Park Conservancy, as well as several small theater and actor groups based in New York City. Ms. Kraus has also been a supporter of the arts, including the MOMA, the Metropolitan Museum and smaller galleries and artists throughout the city.

Ms. Kraus' Upper East Side townhouse sold for approximately $8.975 million in February 2019, that was originally purchased in 1977 for just $132,000. About $8.3 million of the sale proceeds were then deposited in Ms. Kraus' JPM account ending in 409 on February 20, 2019:

| 02/20 | Transfer From Chk Xxxxx1653 | 8,295,657.18 |
|-------|------------------------------|--------------|

Mr. Graham transferred $7 million of the sale proceeds to the 364 Schwab/Francis Financial account, see below.

| 02/20 | 02/20 Domestic Wire Transfer Via: Citibank Nyc/021000089 A/C: Fbo: Charles Schwab & CO., Inc. Ref: For Further Credit To Susan Kraus, Main Account 76313364/Time:17:08 Imad: 0220B1Qgc01C028678 Trn: 5395300051Es | -7,000,000.00 |
|-------|---|---|

He then transferred a total of $950,000 (in two wire transfers) to the 166 account: `

| 02/20 | 02/20 Domestic Wire Transfer Via: Citibank Nyc/021000089 A/C: Fbo: Charles Schwab & CO., Inc. Ref: For Further Credit Susan Kraus, Secondary Account 89479166/Time:15:25 Imad: 0220B1Qgc02C007143 Trn: 5386100051Es | -250,000.00 |
|-------|---|---|
| 02/28 | 02/28 Domestic Wire Transfer Via: Citibank Nyc/021000089 A/C: Fbo: Charles Schwab & CO., Inc. Ref: For Further Credit To : Susan Kraus, Secondary Account 89479166/Time:1 7:28 Imad: 0228B1Qgc03C040499 Trn: 6657300059Es | -700,000.00 |

This account was primarily utilized to transfer funds out of Schwab/Francis Financial to JPM for his own benefit, against Ms. Kraus' interests, from 2019 through 2020, as will be discussed below.

In January 2019, before the sale of Ms. Kraus' Upper East Side townhouse in February 2019, Leslie moved her into a short-term rental unit across the street at 45 East 80th Street. Ms. Kraus' monthly rent was around $8,500 in her first year in the unit and then rose to around $9,000 in her second year. In line with her lifestyle and healthcare needs, Ms. Kraus required approximately $20,000 per month to cover all bills and expenses.

At the same time, Mr. Graham was withdrawing at least $100,000 per month, principally for his own benefit. By December 2019, Mr. Graham was continuously withdrawing substantial amounts of money from Ms. Kraus' accounts until he basically wiped out his mother's life savings.

The National Center on Elder Abuse has found that **84% of elder financial exploitation occurs with family members** (including spouses), <u>40% being an adult child</u>, so financial institutions and professionals must look out for this trend. *See* Legal Analysis, infra, Section V, subsections B.2. and D. Ms. Kraus trusted her son and was unaware of these withdrawals and did not request them or authorize them in any way.

2.  <u>Ms. Kraus' Intent and Will Before and After the Fraud</u>

Ms. Kraus' **original will**, dated October 18, 2007, indicated that she wished for her estate to pass down in equal shares to **all three** adult children:

> **THIRD**: I give, devise and bequeath all the rest, residue and remainder of my property and estate, both real and personal, of whatever kind and wherever located, that I own or to which I shall be in any manner entitled at the time of my death (collectively referred to as my "residuary estate"), as follows:
>
> (a) To those of my children (Leslie Graham Clayton, Jed Graham and Brett Graham) who survive me and to the issue who survive me of those of my children who predecease me, per stirpes. If, however, any such beneficiary then shall be under the age of thirty-five (35) years (each such child being hereinafter referred to as a "Beneficiary"), the share of such Beneficiary shall not be paid or distributed to such Beneficiary but instead shall be given to my Trustee and held by my Trustee, **IN TRUST**, pursuant to the following provisions:

*See* **Exhibit 10**.

Unfortunately, due to Mr. Graham stealing more than $8 million from his own mother, Ms. Kraus explicitly excluded him from her will. Her **revised and most recent will**, dated June 10, 2024, specifically excludes Mr. Graham from the estate, stating that she "specifically do[es] not and [is] not leaving any of [her] estate to BRETT GRAHAM."

> SIXTH:    Except as otherwise provided in this Will, I have intentionally omitted to provide herein for any of my heirs living at the date of my death. I specifically do not and am not leaving any of my estate to BRETT GRAHAM.

See **Exhibit 11**.  In line with the testator, Ms. Kraus' intent in the Sixth Clause, she explicitly excluded Mr. Graham from receiving any of her personal property:

> FOURTH:    I give all my jewelry, clothing, household furniture and furnishings, personal automobiles and other tangible articles of a personal nature, or my interest in any such property, not otherwise specifically disposed of by this Will or any other manner, together with any insurance on the property, to LESLIE GRAHAM CLAYTON and JED GRAHAM.  If either LESLIE GRAHAM CLAYTON or JED GRAHAM fails to survive me, I give all my jewelry, clothing, household furniture and furnishings, personal automobiles and other tangible articles of a personal nature, or my interest in any such property, not otherwise specifically disposed of by this Will or any other manner, together with any insurance on the property, to the survivor of them. I specifically do not leave any of my personal property to my son BRETT GRAHAM.

Lastly, Ms. Kraus made it clear that the residue of her estate can only be split "equally" between Leslie and Jed, with no mention or inclusion of Mr. Graham:

> FIFTH:    I hereby give and devise all of rest and the residue of my estate, wherever situated to my daughter LESLIE GRAHAM CLAYTON and my son JED GRAHAM, to be split equally between them.

### 3.  Ms. Kraus' Change in Circumstances & Discovery of the Thefts

Ms. Kraus began to endure memory issues in 2018, when she had an evaluation indicating she should have additional tests.  As is common with seniors, Ms. Kraus' condition started to degrade, and she had a change in circumstances in late 2020, selling the home she lived in with her husband for 30 years and also losing a couple of very dear friends. Specifically, Ms. Kraus had a neurocognitive evaluation by a medical doctor on December 30, 2020, whereby the doctor concluded Ms. Kraus had "cognitive loss over the last year," and that she "present[ed] cognitive difficulties on examination…" Sometime thereafter, Ms. Kraus was diagnosed with mild cognitive disorder and her short-term memory began to decline. However, she recognized her children, communicated and understood larger concepts, and could have indicated her intentions and needs, if asked. Francis Financial should have inquired about her age, expenses, income, intentions, tolerances, objectives and investment history, but Ms. Kraus was never contacted.

At the end of March 2022, Ms. Kraus' children moved her to Inspir, a senior assisted living home located at 1802 Second Avenue, New York, NY 10128.[20] The monthly fee to live in Inspir was approximately $19,000 in total, which included rent, food, activities, medical management, housekeeping, laundry, and utilities.

On March 13, 2024, Inspir notified Leslie that Ms. Kraus' rent had not been paid in two months and that the staff was unable to reach Mr. Graham. Upon various attempts to contact Mr. Graham about the unpaid rent, Inspir requested that Leslie assist in getting in touch with him as he was not returning any of Inspir's calls. The attempts to engage Mr. Graham on these issues were unsuccessful and two months of rent remained unpaid. On April 8, 2024, Leslie and Jed had to move Ms. Kraus out of Inspir to avoid their mother being evicted, especially at her age. Ms. Kraus was forced to then move in with her daughter Leslie.

Between the initial evaluations and today, as would be expected, Ms. Kraus' cognitive abilities have declined and are described as having "impaired memory, placing her in the 2nd percentile for her age group and education level" as evidenced in her recent assessment on June 6, 2024, annexed at **Exhibit 2**. Ms. Kraus also scored "extremely low" in most categories utilized to test her neurocognitive status:

RESULTS:
- Immediate Memory:                Extremely Low 44
- Visuospatial/Constructional:  Average 102
-  Language:                            Extremely Low 47
- Attention:                            Low Average 88
- Delayed Memory:                 Extremely Low 44                    [21]

6. Daily Living Support:
   - Enhanced IADL Assistance: Provide additional support for instrumental activities of daily living (IADLs) such as managing finances, shopping, and meal preparation.

In the spring of 2024, adult protective services ("APS") was called by Leslie and Ms. Kraus because of a potential fraud in the JPM and Schwab/Francis Financial accounts. At that point, Ms. Kraus and Leslie also filed official and separate claims with APS, as well as a criminal complaint and state reporting.

Upon information and belief, Respondent firms Schwab and JPM only reacted to a call from Leslie and then reached out to APS *after* Leslie called the respective fraud department requesting to freeze Ms. Kraus'

---

[20] *Available at*: https://inspirseniorliving.com/.
[21] *See* page 3 of **Exhibit 2**.

already pilfered accounts. Unfortunately, without any proactive action taken by these financial institutions as required, millions had already been transferred out of Ms. Kraus' accounts. It was too late. On May 9, 2024, Ms. Kraus officially moved to California and temporarily lived with Leslie. In June 2024, Ms. Kraus moved to a senior living community in California full-time.

4.  <u>Introduction to and Account with Francis Financial: Conflicts of Interest</u>

Ms. Kraus was introduced to Ms. Francis by her son Mr. Graham's long-time girlfriend, of twenty years, Courtney Barr. Ms. Barr had originally invested her money with Francis Financial and had become friends with Ms. Francis as they are apparently friends on social media, and have both remained active on social media. Ms. Barr has also donated money to Ms. Francis' personal charity, "Savvy Ladies," which is touted in her biography on its public Francis Financial website.[22]

When Leslie found out in March 2024 that Mr. Graham had not paid Ms. Kraus' rent for two months, nor did he pay her credit card bill, Ms. Barr reached out to Leslie indicating that she (Ms. Barr) had also just discovered that Mr. Graham did not pay their rent, then approximately $30,000 according to Ms. Barr, as well as their joint credit card bill of $75,000. Ms. Barr suggested they should collectively contact Ms. Francis, and then proceeded to create a group chat including herself, Ms. Francis, and Leslie.



---

[22] "…As much as 10% of all Francis Financial proceeds are donated to charities, including Savvy Ladies™, a nonprofit organization founded by Stacy **to educate and empower women to take control of their finances**. Savvy Ladies has helped over 20,000 women through free one-on-one financial counseling, workshops, and retreats…" *Available at:* https://francisfinancial.com/francis_team/stacy-francis/. (Emphasis added).

In a  group chat, Leslie (and shortly thereafter Jed, who learned from Leslie a week or so after she was figuring out the situation out herself) first learned that Francis Financial no longer "manage[d]" Ms. Kraus' accounts:



Throughout the financial relationship, Francis Financial dealt only with Mr. Graham, and not Ms. Kraus. Ms. Kraus signed the Francis Financial IAA (**Exhibit 13**) and filled out four Schwab One account opening applications, granting POA solely to Francis Financial for trading authority, on November 7, 2018.[23] Only in December 2020 did Schwab correspondence indicate that both accounts ending in 364 and 474 had been updated to grant Mr. Graham the second POA with the role listed as "Full Power of Attorney," reflecting Mr. Graham's Schwab POA executed in December 2020.

Thus, from at least the account opening through December 2020, Francis Financial should have communicated only with Ms. Kraus, especially with regards to the withdrawal transactions in her accounts, $2,685,289 in total and at least **$2,525,000** of the total transferred directly to Mr. Graham's personal account at First Republic. Instead, Francis Financial failed to know its customer, and solely communicated with an individual who did not have authorization on the account and whom also was barred from the securities industry for fraud. Due diligence was either skipped or consciously disregarded.

5. 166 Acct Had Inappropriate Withdrawals & Investments: No Reason to Exist: Red Flags

   a. **Failure to investigate account opening and underlying transactions against Ms. Kraus' best interest**

Upon information and belief, Ms. Francis and Mr. Graham had opened account 166, in November 2018 (two full years before the Schwab POA was executed)  with Ms. Kraus' signature, but for Mr. Graham's use. Mr. Graham set up online access and continually signed into the account online to execute trades and withdrawals

---

[23] Ms. Kraus also listed Brett, Leslie, and Jed as 33% beneficiaries for the IRA rollover ending in 474.

that Ms. Kraus was not aware were happening. Ms. Kraus was clearly not making these transactions and Mr. Graham continued to do so under her persona, with Ms. Francis' blessing. Francis Financial and Ms. Francis should never have allowed the account 166 to be opened; it was unnecessary and served no legitimate purpose.

Supporting the foregoing, on August 13, 2024, Schwab stated in email to Leslie that "the trades in 2019 and 2020 were placed under the login SUSANKRAUS on Schwab.com." Annexed at **Exhibit 12**. Mr. Graham transferring over $2.5 million out of Ms. Kraus' accounts to JPM, approximately $1.83 million of which came from the 166 account, before the Schwab POA was executed certainly should have raised alarm bells. The securities transactions were likewise clearly not in Ms. Kraus' best interest. The account, transactions and withdrawals should have been suspicious to Stacy Francis, Francis Financial and Schwab, so an investigation should have ensued at each institution and with Ms. Francis.

There are specialized EFE reports that are typically reviewed by Branch Management, Branch Compliance and Trade Surveillance that should have identified and escalated for further review. Examples of reports include:

- EFE Daily, Monthly Surveillance Report
- Suitability Breach Report
- Potential Churning Report
- Low Priced Securities
- IP Address, Client Address Mismatch Report

Francis Financial and Ms. Francis should have inquired why 166 needed to be opened and how it would be conducted in Ms. Kraus' best interest before opening the account. Further, Ms. Francis and Francis Financial should have noticed and questioned Mr. Graham's $1 million transfer from Francis Financial account ending in 364 to 166 in 2020 before he had validly executed POA over both accounts ($500,000 on May 8, 2020 and $500,000 on September 24, 2020). The total $1 million transfer amongst Francis Financial accounts was used to fund the individual account ending in 166 – to make up for the losses Mr. Graham already sustained, as well as to continue his reckless trading and to have funds at the ready to keep up the transfers to himself via JPM to fund his excessive lifestyle.

Even after the account was approved and opened by Francis Financial and Ms. Francis, inquiry should have been made around the underlying reckless transactions as they were not in line with Ms. Kraus' age, needs

and investment objective. None of the foregoing inquiries were appropriately made. Francis Financial and Ms. Francis gave the utmost deference and discretion to an unemployed SEC barred son clearly pilfering the account.

Further underscoring the neglect of Ms. Kraus, the underlying investments in account ending in 166 were not in her best interest and Francis Financial failed to supervise the transactions therein. Due to Francis Financial's failure to supervise Mr. Graham in managing Ms. Kraus' account, it allowed the account to fall well below standard benchmarks in how she should have been invested:



Ms. Kraus' account ending in 166 incurred at least $112,787 in losses overall, with underlying speculative, illiquid and volatile investments not in line with her age and risk tolerance.[24] Approximately 95% of the losses sustained in account 166 occurred before Mr. Graham had proper POAs, between 2019 and 2020.[25]

---

[24] Account 166 held 4,500 shares of a volatile futures-based ETF, UVXY, for approximately three months. It realized short term losses of nearly $73,000 in August 2020. The account also held 5,000 shares of a speculative pharmaceutical stock, SRNE, which realized short term losses of nearly $20,000 in June 2020. These two investments alone are certainly not in line with Ms. Kraus' age and investment objectives. Many duties were clearly skipped or simply disregarded.

[25] The account application for 166 is signed by Ms. Kraus and dated on November 7, 2018. *See* **Exhibit 1**. Schwab's account verification correspondence dated November 13, 2021, confirmed in writing that Francis Financial was granted POA with trading authority. Annexed at **Exhibit 8**. However, the Schwab POA, granting Mr. Graham POA over the account was not

The underlying transactions in account 166 were certainly inappropriate for an investor in her 80s with cognitive issues, that relied on having her financial nest egg to live out the rest of her life. By December 2020 (when the Schwab POA was executed), Mr. Graham had virtually depleted the 166 account through withdrawals.

### b. Reckless Withdrawals & Trading In Acct 166 Were Red Flags

Mr. Graham's management of account 166 before the Schwab POA was executed in December 2020 should have raised alarm bells, as he was buying and selling risky securities with no rhyme or reason, for an elderly widow well into her retirement. Due to Mr. Graham's complete control and reckless treatment of the 166 account, it should have raised red flags to Francis Financial and Ms. Francis that Mr. Graham had control of all of Ms. Kraus' accounts – including her JPM accounts to which he was transferring large lump sums– and was similarly using those accounts to serve his own interests, not his mother's best interest.

The reckless trading against Ms. Kraus' best interest and round lump sum transfers out of the Francis Financial/Schwab accounts should have raised red flags separately and collectively. Had Francis Financial, Schwab and JPM communicated before the Schwab POA was executed in December 2020 (as regulators strongly encourage), approximately $6 million of Ms. Kraus' wealth would have been left untouched by Mr. Graham's fraud. Yet, the fraud persisted and only grew after the POA was executed.

6. <u>Ms. Kraus' Power of Attorney Forms &  Related Affidavits</u>

### a. The Durable POA

Ms. Kraus' durable POA was executed in New York County, New York State, by her late husband David Kraus, on November 28, 2012 (attached as **<u>Exhibit 3</u>**). Mr. Kraus was the agent and POA for Ms. Kraus until he died, on December 7, 2017. In clause "c" of the durable POA, Mr. Graham was named the successor agent, but he had to acknowledge his acceptance in writing (formally agreeing his duties) before his successorship would be active and actionable and before any financial institution should accept it

---

signed by him until December 17, 2020. Mr. Graham was buying and selling investments against his mothers' best interest, before he was granted the power to trade in the account.

Mr. Graham did not execute the required durable POA until <u>November 18, 2020</u>, in Dade County, Florida, after moving there ~ July 1, 2020. Clause "a" of the POA states  the agent can act on the principal's behalf "…**only after signing** the Power of Attorney before a notary public…"

Due to the foregoing, Mr. Graham had no POA over Ms. Kraus from at least <u>*December 8, 2017, through November 17, 2020*</u>, while a total of $2,485,289 was withdrawn and transferred out of the Francis  Financial/Schwab accounts. Mr. Graham's fraudulent scheme (including two large 6-figure round withdrawals starting in December 2018 and many withdrawals occurring from 2019-2020) occurred while living in New York through June 2020.[26] Specifically, **$2,275,000** of the total transfers out of  the Francis Financial/ Schwab accounts were transferred directly to Mr. Graham's personal First Republic account.

  i.  *Mr. Graham Clearly Breached the POA Terms & Exceeded His Authority: Conflicts of Interest Existed*

Ms. Francis, Francis Financial and Schwab enabled Mr. Graham to breach his fiduciary duties owed under his POA over Ms. Kraus and exceeded his authority because he did not comply with Florida's Power of Attorney Act, Sections (n)(1)-(3) as well as the general clause under the same section, at a minimum:

---

[26] Section g "Modifications" of the Durable POA states "this power of attorney shall be governed by New York law, although I request that it be honored in any state or other location in which I or my property may be found." Yet, Mr. Graham only signed and executed the successor POA appointment on November 18, 2020, in Florida. ***(Next Page FN Cont'd)***

When a POA is created under the laws of another state, and it is also properly executed under those state laws, it "…may be used in Florida, but its use will be subject to Florida's Power of Attorney Act and other state laws. The agent may act only as authorized by Florida law and the terms of the power of attorney." *Available at*: https://www.floridabar.org/public/consumer/pamphlet13/#:~:text=A%20power%20of%20attorney%20may%20be%20used%20to%20give%20another,legal%20documents%20for%20the%20principal.

Pursuant to § 709.2108 under Florida's Power of Attorney Act, "…a power of attorney is exercisable when executed."
Further, pursuant to § 709.2114:

"(1)   An agent is a <u>fiduciary</u>. Notwithstanding the provisions in the power of attorney, an agent who has accepted appointment:

(a)   Must act only within the scope of authority granted in the power of attorney. In exercising that authority, the agent:
1.   May not act contrary to the principal's reasonable expectations actually known by the agent;
2.   Must act in good faith;
3.   May not act in a manner that is contrary to the principal's best interest, except as provided in paragraph (2)(d) and s. 709.2202; and
4.   Must attempt to preserve the principal's estate plan, to the extent actually known by the agent, if preserving the plan is consistent with the principal's best interest…"

(1) "Act according to any instructions from the principal, or, where there are no instructions, in the **principal's best interest**."

Mr. Graham's open and notorious misconduct discussed herein certainly was *not* in Ms. Kraus', the principal's, best interest. He continuously withdrew and transferred funds from Ms. Kraus' accounts to himself, for lavish trips and to afford monthly rent of approximately $30,000 (according to Ms. Barr), [27] while virtually depleting the nest egg his mother relied on to live out her life.

(2) "Avoid conflicts that would impair your ability to act in the principal's best interest."

Mr. Graham also clearly violated this provision because his longtime girlfriend, Ms. Barr, had already been a client of Francis Financial and maintained a friendship with Ms. Francis. This conflict clearly caused Ms. Francis not to question the abhorrent behavior.

(3) "Keep the principal's property separate and distinct from any assets you own or control, unless otherwise permitted by law."

Ms. Francis, Francis Financial, and Schwab knew and/or institutionally knew (given Schwab's technological tools to identify red flags)[28] that Mr. Graham clearly failed to keep Ms. Kraus' property, securities and funds held in the Schwab/Francis Financial accounts, separate and distinct from assets he owns or controls, i.e., his personal First Republic banking accounts. This was clearly against Ms. Kraus' best interest.

---

[27] The real estate listing for his FL home located at ███████████████████ is *available at*: https://www.zillow.com/homedetails/████████████████-Miami-FL-█████████ zpid/:




[28] See legal section D ("Required Supervisory Procedures, Training & Tools: Elder Financial Fraud Red Flags") on FINRA/SEC/NASAA's take on using sophisticated technology tools to root out elder financial exploitation.

"You may not use the principal's assets to benefit yourself or anyone else or make gifts to yourself or anyone else unless the principal has specifically granted you that authority in this document…'

By virtue of Mr. Graham's failure to comply with subsections (1)-(3), Mr. Graham also clearly failed to comply with the above general clause. Mr. Graham used Ms. Kraus' assets to benefit himself and his girlfriend.

The institutions and individuals charged with supervision and compliance knew and/or should have known the limits of the power of attorney they accepted on the account and identified that the limits of the power of attorney had been breached.

### b. Schwab POA

Schwab's POA form named Francis Financial as the RIA and Mr. Graham as the agent with full power of attorney, signed by Mr. Graham in Florida on December 17, 2020, signed by Ms. Kraus on December 21, 2020, and notarized in New York on December 21, 2020 (attached as **Exhibit 4**), *after nearly $2.7 million was already withdrawn without authorization*.

This POA "Grants the authority to trade in [Ms. Kraus'] Account and to…withdraw money and securities in [her] Account…" Notably, in the form, Mr. Graham's occupation is listed as "other" along with a handwritten note indicating he was a "private investor." Schwab and Francis Financial should have done their due diligence and done a background check on Mr. Graham and his storied career. If the Respondents had done a quick Google search, they would have discovered that Mr. Graham was permanently barred from the securities industry by the SEC and should have instituted heightened monitoring of the account(s).

Importantly, Mr. Graham's POA with Schwab is covered by Florida law, therefore the Respondent firms were all charged with duties to report "that a vulnerable adult has been…[financially] abused…" under relevant Florida statutory provisions. Additionally, Francis Financial had its own heightened fiduciary duties as the RIA associated with Ms. Kraus' accounts; Francis Financial required reporting both before and after Mr. Graham moved to Florida.

In an email to Leslie on March 22, 2024, Ms. Francis attempted to explain and disclaim any liability by relying on Mr. Graham's POA executed in December 2020.

30

> Per this Full Power of Attorney (FPOA) – It ==grants the authority== to trade in your mom's Account and to journal transfer or ==withdraw money and securities== in her Account, including ==into the name of the Attorney-in-Fact==.

*See* **Exhibit 14**.

This argument misses the point, i.e., a Power of Attorney may only act as a fiduciary in the best interest of the person over which they have power and for that person's benefit, not their own. It was blatantly clear, as the criminal authorities themselves have seen, that Mr. Graham was engaging in elder financial exploitation, a clearer case there could not be of such an abhorrent breach of fiduciary duty.

Moreover, Ms. Francis glaringly and conveniently left out that before the POA was executed in December 2020, **$2,525,000** in transfers out of Ms. Kraus' Francis Financial/Schwab accounts were made by Mr. Graham, as well as the reckless and speculative trading with related losses in account 166. Mr. Graham did not have the legal authority or power to manage or transact in these accounts. Yet, Francis Financial, Ms. Francis, and Schwab all turned a blind eye and allowed this theft scheme using suspicious money transfers to flourish.

### c. JPM affidavit of POA

JPM's affidavit of the validity of the durable POA was signed by Mr. Graham on January 11, **2020**, yet it was signed by Mr. Graham (again), and notarized, on January 11, **2021**. Whether there was a "beginning of the year" mistake in dating the form in year 2020 rather than 2021, does not matter. The form was not notarized until January 11, 2021, thus there was no power in effect until that date. Any attempt to use the powers under the POA prior to January 11, 2021, would have been invalid as the POA was not yet effective.

Therefore, Mr. Graham did **not** have a valid power to transact within the JPM accounts from January 12, 2020, through January 10, 2021. ***Approximately $2 million was stolen in this period***. This misconduct is covered by Florida reporting law by July 2020 when he moved to Miami. Respondent firm JPM was charged with the same duties to report under the statute, at all times, under its policies and procedures that financial professionals should have been trained on in a proper establishment, maintenance and enforcement of compliance and supervisory procedures around EFE and AML.



See **Exhibit 15**.

7. <u>Mr. Graham's Financial Exploitation and Related Red Flags</u>

**a. Mr. Graham Traveled Around the World on Ms. Kraus' Expense with his Girlfriend**

Mr. Graham and his girlfriend, Ms. Barr, continuously traveled to luxurious places, on Ms. Kraus' money, during the financial relationship with Francis Financial. Interestingly, many of the trips and vacations happened during the time when Mr. Graham did not have a POA over Ms. Kraus' accounts.

2018:
1. 2/27 – Skibo Castle ,Scotland
2. 3/1 – St Petersburg
3. 3/18/18 – Cheltenham Racecourse, Ireland ( racing his horse)
4. 3/25 – St Barts
5. 4/2 – Fairyhouse Racecourse, Ireland
6. 4/15 – Palmilla, Los Cabos
7. 5/4 – Kentucky Derby
8. 7/4 – St Tropez, France

9. 7/15 – Madrid, Spain
10. 8/4 – Galway, Ireland (horse race)
11. 9/22 – Hamptons, Long Island
12. 9/27 – Barcelona, Spain
13. 10/7 – St Tropez, France
14. 10/14 – Limerick Races, Ireland
15. 11/16 – San Francisco, CA
16. 12/1 – London
17. 12/17 – St Barts

- 2019:
1. 2/16 – Guadeloupe
2. 2/20 – Verbier, Switzerland
3. 3/5 – Mardi Gras
4. 3/19 – Cheltenham Racecourse ⟶
5. 4/4 – Liverpool, England (visited for a horse race)
6. 4/15 – Los Cabos
7. 5/4 – Kidare, Ireland (visited for a horse race)
8. 6/11 – NYC
9. 6/28 – Naples, Italy
10. 7/4 – St. Tropez
11. 7/27 – Hamptons
12. 11/15 – San Francisco
13. 12/9 – St. Barts
14. 12/31 – Aspen, Colorado



- 2020:
    1. 2/1 – Dublin, Ireland
    2. 3/10 – London, England
    3. 3/19 – Hamptons
    4. 11/27 – St. Barts

- 2021:
    1. 2/7 – Dublin, Ireland (visited for a horse race)
    2. 6/2 – Milan, Italy
    3. 6/20 – Amalfi Coast, Italy
    4. 7/4 – St. Barts
    5. 12/3 – San Francisco, California
    6. 12/8 – St. Barts

- 2022:
    1. 2/22 – Jamaica[29]
    2. 3/14 – Cheltenham, Ireland (visited for a horse race)
    3. 5/20 – Paris, France
    4. 6/8 – Bulgari Jewelry Gala, France
    5. 7/14 – St. Tropez
    6. 8/22 – Kenya Safari
    7. 9/15 – Notre Dame
    8. 10/13 – St. Barts
    9. 11/15 – World Series in Houston, Texas
    10. 12/18 – St. Barts





- 2023:
    1. 1/1 – London, England
    2. 1/3-7 – Gorilla African Safari
    3. 5/19 – Cannes, France
    4. 5/20 – Venice, Italy



    5. 6/20-23 – Royal Ascot, London
       7/3 – St. Tropez




- 2024:
    1. 1/10 – St. Barts
    2. Sometime in April – Cancun
    3. 6/12 – Capri
    4. 6/17– St. Tropez

As indicated above, Mr. Graham and Ms. Barr continued to travel sometime before the filing of this claim (mid-June 2024), well after the financial and emotional damage had been done.

Contemporaneous with these trips, Ms. Francis managed Ms. Barr's accounts and connected on social media. The pictures below are just a few of many of the pictures the couple consistently posted on social media.

---

[29] AML Compliance typically has specific reports dedicated to high-risk countries, Jamaica is an easy example here. If Mr. Graham went online *or* sent money to a place like Jamaica and Cancun, it probably would have triggered alerts that should have been reviewed and scrutinized by AML Compliance.



Since Ms. Francis was most knowledgeable of the financial pictures of both Ms. Barr and Ms. Kraus, this should have raised alarm bells as to how the couple afforded such luxurious vacations, while Ms. Kraus' accounts had a pattern of large withdrawals and were on a continuous decline

### b. Red Flags & Pattern of Withdrawals

> *i.   Patterns of withdrawals should have been detected and prevented by Respondents – a fraud would have been found in "following the money"*

There was a pattern of withdrawals of funds from Schwab/Francis Financial, which transferred to Ms. Kraus' accounts at JPM, and eventually transferred out to Mr. Graham's personal banking account at First Republic. Specifically, many of the withdrawals were in round amounts of $100,000, with no decimals. Some months had multiple $100,000 withdrawals and transfers in a short period, such as December 2019, January 2022, or June 2023, which certainly should have raised red flags. Especially during a time in which Mr. Graham did not have POA. At a minimum, Respondents knew these transfers were not in line with Ms. Kraus' needs and lifestyle.

For example, while Ms. Kraus' expenses were roughly $20,000 a month, four $100,000 transfers out of the Schwab/Francis Financial account 166 (below) occurred from end of November through December 2019.

| 11/29/19 | 11/29/19 | MoneyLink Txn | Tfr JPMORGAN CHASE BAN, SUSAN KRAUS | (100,000.00) |
| 12/02/19 | Auto Transfer | | BANK TRANSFER TO BROKERAGE | 100,000.00 |
| 12/05/19 | Auto Transfer | | BANK TRANSFER TO BROKERAGE | 100,000.00 |
| 12/09/19 | Auto Transfer | | BANK TRANSFER TO BROKERAGE | 100,000.00 |

[30]

**Change in Account Value** — This Period

| | |
|---|---|
| Starting Value | $ 772,096.33 |
| Credits | 3,198.05 |
| Debits | (300,000.00) |
| Transfer of Securities (In/Out) | 0.00 |
| Income Reinvested | 0.00 |
| Change in Value of Investments | 2,636.80 |
| Ending Value on 12/31/2019 | $ 477,931.18 |
| Accrued Income | 17.55 |
| Ending Value with Accrued Income | $ 477,948.73 |
| Total Change in Account Value | $ (294,165.15) |
| Total Change with Accrued Income | $ (294,147.60) |

*Id.*

When these large round sums in the Schwab/Francis Financial accounts were withdrawn, they were then transferred to Ms. Kraus' JPM account. For example, in the same month of December 2019, four exact amounts of $100,000 transferred from Schwab/Francis Financial into JPM account 409, then out of JPM to Mr. Graham's account at First Republic:

**DEPOSITS AND ADDITIONS**

| DATE | DESCRIPTION | | AMOUNT |
|---|---|---|---|
| 12/02 | Schwab Brokerage Moneylink | PPD ID: 9005586224 | $100,000.00 |
| 12/04 | Schwab Brokerage Moneylink | PPD ID: 9005586224 | 100,000.00 |
| 12/05 | Schwab Brokerage Moneylink | PPD ID: 9005586224 | 100,000.00 |
| 12/09 | Schwab Brokerage Moneylink | PPD ID: 9005586224 | 100,000.00 |
| 12/31 | Interest Payment | | 0.93 |
| **Total Deposits and Additions** | | | **$400,000.93** |

[31]

In that same month, exact amounts of $100,000 were transferred to the JPM savings account ending in 750:

**ELECTRONIC WITHDRAWALS**

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 12/02 | 12/01 Online Transfer To Sav ...6750 Transaction# 8918282354 | $100,000.00 |
| 12/05 | 12/05 Online Transfer To Sav ...6750 Transaction# 8933251786 | 200,000.00 |
| 12/17 | 12/17 Online Transfer To Sav ...6750 Transaction# 8976846512 | 100,000.00 |
| **Total Electronic Withdrawals** | | **$405,870.41** |

*Id.*

---

[30] December 2019 statement for Schwab/Francis Financial account ending in 166 attached as **Exhibit 5**.

[31] Note: upon information and belief, the deposit dated 12/2/2019 (Monday) reflects the same $100,000 that was originally transferred out of the Schwab/Francis Financial account on 11/29/2019 (Friday) in the first screenshot seen on page 31. December 2019 statement for JPM accounts ending in 409 and 750 attached at **Exhibit 6**.

Then, the same exact amounts of $100,000 were transferred out of JPM entirely to what is believed to be Mr. Graham's personal First Republic banking account ending in 150:

| | TRANSACTION DETAIL | | |
|---|---|---|---|
| DATE | DESCRIPTION | AMOUNT | BALANCE |
| | Beginning Balance | | $66,178.49 |
| 12/02 | Online Transfer From Chk ...0409 Transaction#: 8918282354 | 100,000.00 | 166,178.49 |
| 12/02 | Online Transfer 8918283908 To Bg #######4150 Transaction #: 8918283908 | -100,000.00 | 66,178.49 |
| 12/05 | Online Transfer From Chk ...0409 Transaction#: 8933251786 | 200,000.00 | 266,178.49 |
| 12/05 | Online Transfer 8933252363 To Bg #######4150 Transaction #: 8933252363 | -100,000.00 | 166,178.49 |
| 12/16 | Online Transfer 8967094032 To Bg #######4150 Transaction #: 8967094032 | -100,000.00 | 66,178.49 |
| 12/17 | Online Transfer From Chk ...0409 Transaction#: 8976846512 | 100,000.00 | 166,178.49 |
| 12/17 | Online Transfer 8978936017 To Bg #######4150 Transaction #: 8978936017 | -100,000.00 | 66,178.49 |
| 12/31 | Interest Payment | 6.66 | 66,185.15 |
| | Ending Balance | | $66,185.15 |

Had the Respondent firms "followed the money," communicated and shared information between institutions as FINRA and Office of the Comptroller of the Currency tells them they can do (as will be discussed below), the fraud would have been found and stopped. Instead, they ***enabled Mr. Graham's scheme to continue and grow over years***, ultimately depleting Ms. Kraus' over $8 million nest egg that would have carried her through her life and bequeathed to her chosen heirs. This is a <u>known</u> pattern of elder financial exploitation that financial institutions are advised to look out for, as will be discussed in the legal section B.2.

It is highly likely that these transactions would have resulted in AML Surveillance alerts at each financial institution.  Standard industry practice for review of the alerts would have been to:

- Reach out to the branch to determine reason for transfers and why made in structured round dollar amounts.
- Perform research on the parties involved (i.e., Barred from industry)
- Review new account documents, POA, etc.
- Review notes and communications in client files
- Reach out to other FI via 314(b) for information on what is occurring at the other FI
- Interview client if deemed necessary
- Perform a holistic review of all activity that occurred (12 months' worth of transactional activity, etc.). Also, reaching out to other areas of Compliance to determine if they had alerts, investigations or concerns raised on the client.

In addition, standard industry practice would have been to file a Suspicious Activity Report (SAR).  The type of activity being reported would most likely have included but not been limited to:

- Section 32.Z - Structuring "Other"
- Section 34.M – Fraud "Wire"
- Section 36.F – Money Laundering "Suspicious EFT/Wire transfers"
- Section 36.M – Money Laundering "Transactions out of pattern for customer(s)
- Section 38.A – Other Suspicious Activity "Account Takeover"
- Section 38.D - Other Suspicious Activity "Elder financial exploitation"
- Section 38.P - Other Suspicious Activity "Transactions with no apparent economic, business or lawful purpose"

The AML and Fraud Departments completely failed.

### ii.    100 donations to ActBlue should have been caught by Respondent JPM

Indicating a vulnerable senior citizen to JPM, there were approximately 100 unauthorized donations made from Ms. Kraus' JPM account 962 to ActBlue, a democratic non-profit, in 2020:[32]

| PURCHASE | | | |
|---|---|---|---|
| 09/28 | ACTBLUE*STOP.REPUBLICANS actbluecc.com MA | 10/04 | ACTBLUE*DSCC-SenateDems actbluecc.com MA |
| 09/28 | ACTBLUE*STOP.REPUBLICANS actbluecc.com MA | 10/05 | AMARANTH RESTAURANT NEW YORK NY |
| 09/28 | EMPORIUM WINE SHOP 1534 NEW YORK NY | 10/05 | ACTBLUE*ENDCITIZENSUNITED actbluecc.com MA |
| 09/28 | ACTBLUE*STOP.REPUBLICANS actbluecc.com MA | 10/07 | ACTBLUE*STOP.REPUBLICANS actbluecc.com MA |
| 09/28 | ACTBLUE*STOP.REPUBLICANS actbluecc.com MA | 10/07 | ACTBLUE*STOP.REPUBLICANS actbluecc.com MA |
| 09/28 | WLIW 212-5602888 NY | 10/07 | ACTBLUE*STOP.REPUBLICANS actbluecc.com MA |
| 09/29 | ACTBLUE*MARKPOCAN 617-5177600 MA | 10/08 | CITARELLA NEW YORK NY |
| 09/29 | ACTBLUE*STOP.REPUBLICANS actbluecc.com MA | 10/08 | ACTBLUE*ELECT.DEM.WOMEN actbluecc.com MA |
| 09/30 | ACTBLUE*DCCC-HouseDems actbluecc.com MA | 10/09 | ACTBLUE*PROGRESSIVEACTION actbluecc.com MA |
| 10/01 | ACTBLUE*CBC.PAC actbluecc.com MA | 10/09 | ACTBLUE*JOE.BIDEN 617-5177600 MA |
| 10/01 | ACTBLUE*SEANPMALONEY actbluecc.com MA | 10/09 | NYC TAXI 1246 12460010 LONG ISLAND C NY |
| 10/01 | IN *BUTTERFIELD MARKET 917-5570331 NY | 10/09 | DUANE READE #14191 NEW YORK NY |
| 10/01 | ACTBLUE*DCCC-HouseDems actbluecc.com MA | 10/12 | D J*WALL-ST-JOURNAL 800-568-7625 MA |
| 10/01 | CITARELLA NEW YORK NY | 10/11 | ACTBLUE*CBC.PAC actbluecc.com MA |
| 10/03 | CITARELLA NEW YORK NY | 10/13 | ACTBLUE*JOE.BIDEN actbluecc.com MA |
| 10/03 | ACTBLUE*JOE.BIDEN 617-5177600 MA | 10/14 | APPLE.COM/BILL 866-712-7753 CA |
| 10/02 | ACTBLUE*MEDICARE.FOR.ALL actbluecc.com MA | 10/15 | TST* SERAFINA FABULOUS PI NEW YORK NY |
| 10/02 | ACTBLUE*EQUALITY.PAC actbluecc.com MA | 10/17 | ACTBLUE*STOP.REPUBLICANS actbluecc.com NY |
| 10/02 | ACTBLUE*STOP.REPUBLICANS actbluecc.com MA | 10/16 | ACTBLUE*STOP.REPUBLICANS actbluecc.com MA |

Upon information and belief, JPM actually looked at Ms. Kraus' account in the Act Blue review, but negligently failed to identify and escalate the serious financial exploitation of a vulnerable senior, while crediting a marginal amount of the Act Blue donations back to Ms. Kraus' account. This can be best described with the saying: "tripping over dollars to pick up pennies." This incident also should have put JPM on notice that Ms. Kraus was susceptible to financial frauds and schemes. Had JPM instituted heightened review of her accounts going forward, fraudulent transfers to Mr. Graham would have been caught.

---

[32] NOTE: In April, July, August, September, October, November and December 2021, Ms. Krause got new credit cards each of those months because of ongoing fraud on her account, another opportunity to check in on a vulnerable senior client that was missed.

The New York Times published an article on this very issue, "*How Deceptive Campaign Fund-Raising Ensnares Older People,*"[33] citing Ms. Kraus' situation and quoting both Mr. Graham and Ms. Kraus (who clearly was able to communicate about her account, as her own thoughts were published in a reputable paper).

> **'A systemic campaign finance abuse issue'**
>
> Susan Kraus is an 81-year-old New Yorker who, federal records show, made around 175 separate donations last year via ActBlue, totaling about $4,500.
>
> "That's impossible," Ms. Kraus said in an interview. "Never. I don't know how that happened. But it wasn't me doing it." Both she and her son, Brett Graham, said she experiences short-term memory loss.

Mr. Graham publicly indicated his awareness of his mother's declining mental capacity, while he was already withdrawing millions of dollars from her accounts, quietly and on his own volition.

> "It's almost like they were duplicating it," she said. "Like there were tricks." She recalls making donations with her phone but nothing at that scale, nor to the range of groups that records show she contributed to.
>
> "There isn't a nice way to spin it," said Mr. Graham, who helps manage his mother's financial affairs. "This is a systemic campaign finance abuse issue." He added that the overlapping pattern of giving was "not what a human being would do." He was able to receive refunds for roughly $2,500 from two credit cards.

Additionally, Mr. Graham publicly indicated that he "help[ed] manage his mother's financial affairs;" meanwhile, he was simply controlling her financial affairs for his benefit and her detriment. Ironically, Mr. Graham calls the unauthorized donations "'financial abuse'" and points out that he believes the "overlapping pattern" was "'not what a human being would do.'"

Mr. Graham, aghast at a $4,500 donation scam, financially exploited his mother and engaged in patterns of withdrawals, of more than $8 million, that the Respondent firms should have *at least* detected and prevented, particularly when they actually had supervision and compliance eyes specifically on this account for the Act Blue scam, **indicating a vulnerable senior**. *See* legal sections B-C.

---

[33] "How Deceptive Campaign Fund-Raising Ensnares Older People," attached as **Exhibit 7**.