# EXHIBIT A
# (PART 2 OF 6)

**K.  The Conduct Was Contradictory to Francis Financial's Alleged Mission**

This conduct completely contradicted Francis Financial's publicly touted mission to protect and help financial plan for elderly widows. For example, a story on Francis Financial's firm website of a former client's success story perfectly mirrors Ms. Kraus, yet "Rebecca" was seemingly planned for and protected while Ms. Kraus was not.[34] Specifically, Francis Financial explained that Rebecca was a widow who lived in the Upper East Side and loved the theatre, just like Ms. Kraus. Further, that "Her goal was to invest the proceeds from the sale of the home valued at $3,400,000 and live off the income, and she also wanted to be able to leave money to her children and grandchildren," and that Francis Financial "…helped Rebecca put a financial plan in place where she could move to a rental apartment close to Central Park and continue to give to her family and the community."

Ms. Kraus' goal and story were almost identical to Rebecca's. Ms. Kraus sold her and her late husband's townhouse in the Upper East Side in February 2019, for nearly $9 million, and moved to a rental apartment. Most of Ms. Kraus' townhouse sale proceeds were then handed over to Ms. Francis, as a fiduciary, to plan for Ms. Kraus to preserve capital, live off income, and leave wealth behind for her family. Specifically, $7 million of the proceeds were transferred into the Francis Financial account ending in 364 and $950,000 of the proceeds were transferred into the Francis Financial account ending in 166. Instead of supervising and protecting Ms. Kraus' accounts, Respondents and Ms. Francis collectively allowed her son to pillage them and use them to his benefit. Unlike Rebecca, Ms. Kraus has had to uproot her life and move because she could no longer afford New York.

Ms. Francis of Francis Financial has even authored articles on the very issue at hand, elder financial exploitation, such as her article on the "I Care A Lot" film.[35] Ms. Francis stated that "…elder financial abuse is a very common crime in the U.S. This type of financial abuse cost seniors about $2.9 billion in 2019, according to

---

[34] A story on the firm website of a former client's success story perfectly mirrors Ms. Kraus, yet "Rebecca" was seemingly planned for and protected while Ms. Kraus was not. The referenced testimonial is *available at*: https://francisfinancial.com/client-success-stories/#ps2id-loss-loved.

[35] *Available at*: 'I Care A Lot' film can teach us how to prevent elder financial abuse (cnbc.com). Last visited August 21, 2024. In fact, Ms. Francis cared none.

various reports. With those 50 years of age and older controlling some 70% of the nation's wealth, the likelihood of this type of scheme will only increase. That makes baby boomers and older generations the perfect prey."

Ms. Francis and Francis Financial were very much aware that someone like Ms. Kraus would be the "perfect prey" for financial exploitation. Further, that she could be the perfect prey for a family member, like Mr. Graham, by stating "…most scammers are not strangers to their victims and tend to be family members or somebody they already know." One of their "warning signs that a family member may have fallen prey to senior financial abuse" is exactly what happened here: "Uncharacteristic activity in your family member's bank accounts or unusual ATM withdrawals," yet Respondents and Ms. Francis consciously disregarded unusually large transfers out of Ms. Kraus' Francis Financial accounts to accounts at JPM Private Bank with a FINRA license professional, that were not in line with her lifestyle, needs, or investment objectives.

Ms. Francis then concluded the same article by stating that "The movie… demonstrates how vital it is… for financial professionals [to keep a close eye on] clients who need [] support more than ever." Yet, Respondents and Ms. Francis failed to take that advice and failed to detect warning signs of Mr. Graham's fraudulent scheme, allowing him to steal more than $8 million from his elderly widowed mother, Respondents' client, in just a few years' span.

### L.  <u>Schwab and JPM Are Just as Liable Based on their Obligations</u>

There is no question, that all of the activity at JPM that had a FINRA licensed professional looking at and attached to the Kraus JPM accounts to recommend products and services had all of the responsibility to follow FINRA, SEC, FinCEN and state guidelines, just as Schwab did. Moreover, Schwab may failingly argue that "it was just a clearing firm" but that should be of no avail to the Panel in this case.

The responsibility of Schwab even with RIA Francis Financial as an intermediary is not diminished. Schwab still has an AML responsibility if an account on their books has suspicious activity as FINRA points out:

https://www.finra.org/rules-guidance/key-topics/aml/faq

**22. Can an introducing or clearing firm be <mark>relieved of AML obligations</mark> to the extent that the other is monitoring for suspicious activities?**

<mark>No.</mark> While a clearing firm can provide tools to help the introducing firm monitor its accounts for potential suspicious activity, <mark>all broker-dealers have an independent responsibility</mark> to comply with the suspicious activity reporting requirements. Introducing and clearing firms are both responsible for filing SARs for suspicious transactions "conducted or attempted by, at, or through" the firm. Introducing and clearing brokers involved in the same transaction may, but are not required to, file a SAR jointly as long as it includes all relevant facts about the transactions and is otherwise permissible under the law. For example, a SAR filed by the clearing firm in which the introducing broker is the subject could not be shared.

## M. Current Related Court Proceedings and Investigations Against Mr. Graham

There are multiple related court proceedings and investigations involving Mr. Graham's emotional and financial exploitation of his mother, Ms. Kraus. The various entities include the FBI, the Miami Police Department (Case No. 240607-0039377), the New York County District Attorney's Office, and both the San Marino Police Department and the CA County of Orange Superior Court regarding a temporary restraining order ("TRO") ordered against Mr. Graham, annexed at **Exhibit 9**.

In the TRO, Ms. Kraus indicated that an abusive event occurred on July 29, 2024, which caused her "extreme lack of sleep and worry." Ms. Kraus further stated that she "cant pay rent because of him stealing from [her]." *Id.* at page 8. Ms. Kraus also indicated that she did not make Mr. Graham aware of the TRO because she was "scared how he would react." *Id.* at page 12. In the addendum to the TRO, Ms. Kraus explained that Mr. Graham showed up to her home "unannounced" and has been calling her to ask about "access" to her accounts. *Id.* at page 15. Ms. Kraus further wrote to the court that Mr. Graham stole over $8.45 million dollars from her, among other things, and that she is scared of him and does not want to "see him or talk to him ever again." *Id.* at page 16. Due to the recent surprise appearances and calls as well as financial account access demands from Mr. Graham, Ms. Kraus was forced to disable her cell phone and obtain a new phone number. Only a handful of people are aware of Ms. Kraus' new phone number, to avoid Mr. Graham continuously harassing her.

## VII.    LEGAL ANALYSIS: ELDER FINANCIAL EXPLOITATION

### A.  Introduction

On May 24, 2018, the Senior Safe Act became federal law designed to promote reporting of suspected elder financial abuse by protecting "covered financial institutions"[36] from liability for the consequences of reporting potential financial exploitation of a senior citizen to a covered agency,[37]  See www.finra.org/sites/default/files/2019-05/senior_safe_act_factsheet.pdf.  In June 2021, regulators offered free resources to investment professionals and financial service firms to assist firms in implementing the ***requirements*** of the Senior Safe Act.  https://www.finra.org/media-center/newsreleases/2021/finra-sec-and-nasaa-offer-free-resource-securities-firms-assist

Registered investment advisors and brokerage firms are also ***required*** to abide by the state laws of the jurisdictions in which they do business as well as where its customer resides, including the jurisdictions in which powers of attorney for its customers reside, as well as federal laws and any applicable FINRA Rules that may directly apply or apply via fiduciary and negligence standards of care through common law.

For supervisory and compliance purposes, the most "restrictive" state, federal law or rule prevails.  This means for this case that  while some provisions of elder financial exploitation laws at FINRA and some state laws are *permissive* in terms of how to treat elders' accounts and transactions if there are red flags that they are possibly being exploited, others are *mandatory*. NASAA developed a strict *Model Act to Prevent Vulnerable Adults from Financial Exploitation* (the "NASAA Model Financial Exploitation Act") that ***requires*** brokerage firms and investment advisors to act to protect seniors from elder financial exploitation. To date, 39 states have adopted this model act, including Florida.

---

[36] This includes credit unions, depositories, institutions, investment advisors, broker-dealers, insurance companies, insurance agencies, and transfer agents – including employees.

[37] This includes a state securities regulator or law enforcement authority, a state or local adult protective services agency, the SEC, an SEC-registered national securities association (e.g., FINRA), a federal law enforcement agency, or any Federal agency represented in the membership of the Financial Institutions Examination Council.

Applicable in this case, Florida law applied to the underlying accounts at issue because of the situs of the power of attorney, both of which had adopted the NASAA Model Financial Exploitation Act. Thus in Florida, reporting suspected elder financial exploitation in this case was ***required***.

Elder financial exploitation (EFE) and anti-money laundering (AML) both relate to the misuse of financial resources for criminal or illicit purposes. EFE is when a family member, caregiver, or other individual illegally or improperly uses an elderly person's financial resources.  AML is the process of preventing and detecting money laundering activities, which are when individuals or organizations try to hide the illegal origin of funds.  Financial institutions have supervisory procedures and compliance tools to monitor for and prevent EFE, including the use of anti-money laundering and fraud monitoring software to create alerts to changes in their financial behavior, such as spikes in outgoing wire, ACH, or cash activity.

Further, it is important to note that federal law permits and advises professionals **to *coordinate across financial institutions*** serving the elder community, <u>including banks</u>. Since it is well known that money is often transferred between financial institutions in fraudulent behavior, information sharing between institutions[38] and with the government is necessary in a host of situations with red flags. JPM certainly should have detected red flags as to the pattern of large withdrawals out of Ms. Kraus' accounts, that were not in line with her 30 years with JPM, especially during the period in which Mr. Graham did not have a valid POA. After all, conduct considered elder financial exploitation is also deemed suspicious activity for which financial institutions are required to complete "Suspicious Activity Reports" ("SARs") to the Financial Crimes Enforcement Network

---

6. Integration and Data Sharing: Advanced AML platforms enable seamless integration with other systems within financial institutions, facilitating data sharing and collaboration. This interconnectedness is vital for creating a comprehensive view of customer activity and detecting complex money laundering schemes.

[38] https://www.fastercapital.com/content/AML--Anti-Money-Laundering---Navigating-the-Waters-of-Compliance--AML-Strategies-in-the-KYC-Process.html

(FinCEN)[39] that may violate anti-money laundering rules under the Patriot Act,[40] Gramm-Leach-Bliley Act

(GLBA),[41] federal and state securities, criminal and banking statutes. In FINRA's Frequently Asked Questions

Regarding FINRA Rules Relating to Financial Exploitation of Senior Investors:

> ## Information Sharing
>
> **Q.6.1. May a member disclose information to another financial institution related to the suspected financial exploitation of a Specified Adult?**
>
> In many instances, a member would be permitted to disclose information to another financial institution related to the suspected financial exploitation of a Specified Adult. Regulation S-P allows a member to share nonpublic personal information with non-affiliated third parties for certain purposes, including to protect against or prevent actual or potential fraud, unauthorized transactions, claims, or other liability.[5] In addition, Section 314(b) of the USA PATRIOT Act permits a financial institution, upon providing notice to the United States Department of the Treasury, to share information with other financial institutions in order to identify and report to the federal government activities that may involve money laundering or terrorist activity.[6]
>
> ---
>
> 6. *See* 31 CFR § 1010.540 (Voluntary information sharing among financial institutions); the United States Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN") SAR Activity Review Issue 23 (Apr. 30, 2013) (providing examples of information sharing among financial institutions pursuant to Section 314(b), including for suspected financial exploitation of a senior); and additional information from FinCEN available at https://www.fincen.gov/section-314b. *See also* 31 CFR § 1023.320(e) (Reports by brokers or dealers in securities of suspicious transactions) regarding the requirement to maintain the confidentiality of suspicious activity reports.

---

[39] "Perpetrators of elder theft are often family members and non-family caregivers who abuse their relationship and position of trust. As identified by FinCEN in 2019 in its analysis of a statistically significant, random sampling of SAR narratives, a family member was involved in the theft of assets from older adults in 46 percent of elder theft cases reported between 2013 and 2019. Trusted persons who commit elder theft can also include familiar associates and acquaintances such as neighbors, friends, financial services providers, other business associates, or those in routine close proximity to the victims. Instances of elder theft often follow a similar methodology in which trusted persons may use deception, intimidation, and coercion against older adults in order to access, control, and misuse their finances. … This can take many forms, including the exploitation of legal guardianships and power of attorney arrangements…" *FinCen Advisory on Elder Financial Exploitation*, FIN-2022-A002 (June 15, 2022)(emphasis added, citations omitted). May be found at: LINK.

[40] Financial institutions "shall establish appropriate, specific, and, where necessary, enhanced, due diligence policies, procedures, and controls that are reasonably designed to detect and report instances of money laundering through those accounts." Section 312(a) (i) (1) of the USA PATRIOT Act, Public Law 107-56.

[41] GLBA has specific exemptions allowing financial institutions to report nonpublic personal information to third parties, such as state Adult Protective Services or law enforcement in order to "protect against or prevent actual or potential fraud, unauthorized transactions, claims or other liability," "comply with Federal, State, or local laws, rules, and other applicable legal requirements," or "comply with a properly authorized civil, criminal, or regulatory investigation, or subpoena or summons by federal, state or local authorities." See 15 U.S.C. 6802(e)(3)(B), and (e)(8).

*Frequently Asked Questions Regarding FINRA Rules Relating to Financial Exploitation of Senior Investors*, FINRA    https://www.finra.org/rules-guidance/guidance/faqs/frequently-asked-questions-regarding-finra-rules-relating-financial-exploitation-seniors.

When seeing frequent large and obviously not living expense type withdrawals to repeating outside institutions, even if in the senior's name, it behooves the wiring and receiving institutions to communicate when obvious red flags of elder financial exploitation began, which unfortunately never happened in this case. The financial institutions at issue in this arbitration failed to meet their federal and state requirements.  At no time at which red flags appeared in the accounts at issue were any meaningful activities undertaken to avoid the elder financial exploitation in the accounts of the vulnerable senior client. The AML and Fraud Departments of financial institutions must be trained and have policies and procedures to work together to root out fraud and stop it, as well as <u>controls</u> in place.  The controls can be in the form of technology (e.g. block specific activity), Transaction Monitoring and other processes. In addition to industry standard policies and procedures, there are typically "Desktop Procedures" that provide step by step actions to take.  For example:

1.  If there is a 3rd party wire request, and
2.  The client is over 65, then
3.  Escalate to Compliance for review

AML Officers and Auditors will often use these Desktop Procedures when performing "<u>Root Cause</u>" analysis after something goes wrong.  This analysis is used to determine if there is a gap in the process, breach of procedure by employees, or both.

**B.  <u>"Know Your Customer" & Elder Financial Exploitation</u>**

1.  <u>Know Your Customer</u>

Brokerage firms have always had a "Know Your Customer" rule, and at all relevant time, related to this case, that has been FINRA Rule 2090 ("KYC")(emphasis added):

Every member shall use reasonable diligence, in regard to the opening and maintenance of every account, to know (and retain) ***the essential facts concerning every customer and concerning the authority of each person acting on behalf of such customer***.

SEC Rule 17a3(17) requires brokerage firms to create, maintain, and periodically update records for each account it holds with an individual customer, including, but not limited to, the customer's address, annual income, and investment objectives. Respondents collectively failed to update or keep accurate records of Ms. Kraus' address and assisted living situation. Mr. Heredia  indicated to Leslie that JPM did not call Ms. Kraus to request her correct or updated address because JPM had the incorrect telephone number on file.  Ms. Kraus had consistently visited the Madison Branch for years, thus, Mr. Heredia, or any other JPM employee, could have simply asked for Ms. Kraus' accurate mailing address or phone number during any of her recurring in-person visits. Respondents also apparently failed to periodically update Ms. Kraus' annual income and investment objectives as well.

Included in KYC for a senior citizen is knowing spending habits and physical mental abilities. This case straddles "Suitability" and "Regulation BI" heightened best interest standards, but in terms of knowing your customer, the questions and understanding is the same:

Therefore, firms cannot adequately assess the suitability of a product or transaction for a particular customer without making reasonable efforts to obtain information about the customer's age, life stage and liquidity needs. Other questions to consider include:

- Is the customer currently employed? If so, how much longer does he or she plan to work?

- What are the customer's primary expenses? For example, does the customer still have a mortgage?

- What are the customer's sources of income? Is the customer living on a fixed income or anticipate doing so in the future?

- How much income does the customer need to meet fixed or anticipated expenses?

- How much has the customer saved for retirement? How are those assets invested?

- How important is the liquidity of income-generating assets to the customer?

- What are the customer's financial and investment goals? For example, how important is generating income, preserving capital or accumulating assets for heirs?

- What health care insurance does the customer have? Will the customer be relying on investment assets for anticipated and unanticipated health costs?

See *FINRA Regulatory Notice 07-43*, p. 3 (September 10, 2007)["Reg Notice 07-43"].

Whether or not the elder financial exploitation occurred through transactions or withdrawals, solicited or unsolicited, given the enormous emphasis throughout the securities industry on elder financial exploitation and red flags of the same,  the above facts are known KYC tools to assess the appropriateness/inappropriateness of what was happening in a senior's account.  Moreover, a financial intermediary for those fiduciaries holding powers of attorney for senior citizens who must act in the best interest of the person for whom they serve are not excused from mandatory state reporting laws designed to protect seniors.

### a.  FINRA Rules Designed to Combat Elder Financial Exploitation

To combat elder financial exploitations that are known to occur, FINRA created Rules 2165 and 4512.  In the roll out of Rule 2165, FINRA well described financial exploitation:

> The rule has a broad definition of "financial exploitation." Specifically, financial exploitation would include: (A) the wrongful or unauthorized taking, withholding, appropriation, or use of a specified adult's funds or securities; or (B) any act or omission taken by a person, including through the use of a power of attorney, guardianship, or any other authority, regarding a specified adult, to: (i) obtain control, through deception, intimidation or undue influence, over the specified adult's money, assets or property; or (ii) convert the specified adult's money, assets or property.

*See FINRA Regulatory Notice 17-11*, p. 3, (March 2017).

FINRA Rule 2165 authorizes a temporary hold after notification to the trusted contact person[42] if one exists (which will be discussed in detail later). In that regulatory notice, it is not ignored that sometimes the financial exploitation is coming from a family member and cautions firms that it requires notification before the temporary hold "***unless the member reasonably believes that the trusted contact person is engaged in the financial exploitation***." *Id*.[43]  In this case, Schwab and Francis Financial had Ms. Kraus' other family members'

---

[42]  FINRA Rule 4512 requires firms to make and document attempts to obtain a "trusted contact person."

[43] *See also, Frequently Asked Questions Regarding FINRAs Rules Relating to Financial Exploitation of Senior Investors*, ["FAQs on Senior Exploitation"], https://www.finra.org/rules-guidance/guidance/faqs/frequently-asked-questions-regarding-finra-rules-relating-financial-exploitation-seniors, (undated)("a member may refrain from providing notification to an authorized party or the trusted contact person if the member reasonably suspects that the authorized party or trusted contact person, respectively, may be engaged in the financial exploitation of the Specified Adult but needs additional time to conduct an investigation.")

names in its own internal records, with social security numbers and identifying information:



FINRA Rule 4512(a)(1)(F) "requires firms, for each of their non-institutional customer accounts, to make a reasonable effort to obtain the name and contact information for a trusted contact person (TCP)…"[44] The FINRA exam conducted in 2022 found that firms may fall out of compliance with FINRA Rule 4512 by failing to make a reasonable attempt to obtain TCP information and/or "not providing a written disclosure explaining the circumstances under which the firm may contact a TCP when seeking to obtain TCP information." FINRA further established effective practices for compliance with FINRA Rule 4512: (A) offering training "on the warning signs of potential: (1) customer exploitation; (2) diminished capacity; and (3) fraud perpetrated on the customer;" (B) "emphasizing the importance of TCP and promoting effective practices; (C) "establishing specialized groups or appointing individuals to handle situations involving elder abuse or diminished capacity;" and (D) "firm outreach – hosting conferences or joining industry groups focused on protecting senior customers." *Id.*

FINRA has acknowledged that deciding to report financial exploitation is not a riskless decision in FINRA's May 3, 2022 podcast *The Essential Senior Investor Protection Tools: FINRA Rules 2165 and 4512* ["Essential 2165 & 4512 Podcast"] but guided members that reporting is less risk, i.e., having the money verses it being gone from the account:

---

[44] *See* page 20 of the "2022 Report on FINRA's Examination and Risk Monitoring Program," *available at*: https://www.finra.org/sites/default/files/2022-02/2022-report-finras-examination-risk-monitoring-program.pdf.

14:23 - 15:23

Jeanette Wingler: Well, I would say, we recognize that you're in a challenging position, because if you believe that your customer is being exploited, I do think that you have risk on either side of that decision. If you choose to place the temporary hold because you believe there's exploitation and there is exploitation happening, the customer still may be upset about it either because they refuse to believe that it is a scam, that can be one example, or they continue to just want to pursue the course of action that they're in. But on the other hand, if you believe that the customer's being financially exploited, but yet you disburse the money, there's also, I think, risk associated with that decision. I think for me personally, if I was a rep facing that, I would rather still have the money in the account and face that situation than face the situation where the money has left the account and now the customer or the customer's family is upset because you didn't stop the behavior.

15:32 - 15:44

Jim Wrona: And Jeanette, you and I, both worked at large law firms before we came to FINRA, and I can tell you as a former litigator, you want that money there and defend that action rather than have the money gone. That's a tougher position to be in.

The easier and less risky position is to report, as Jim Wrona suggests, as had anyone in this case reached out to law enforcement or another family member when the elder financial exploitation started, we would not have been here today. In short, given the outsized transactions at issue herein, Respondents did not know or even try to know their customer as well as never tried to stop the elder financial exploitation.

Rule 2165 is a mandatory rule to the extent explained in the supplementary material related to the rule:

> • • • **Supplementary Material:** --------------
> **.02 Training.** A member relying on this Rule **must** develop and document training policies or programs reasonably designed to ensure that associated persons comply with the requirements of this Rule.

Further, all training policies and programs must be effectuated. https://www.finra.org/rules-guidance/rulebooks/finra-rules/2165 However, although this FINRA Rule was adopted in 2018, note that these topics had been discussed since 2007 and earlier, as well as overlap with suspicious activity reports under the Bank Secrecy Act and suspicious activity reporting by financial institutions since 1970. There was never an excuse to let an elder be financially exploited.

2. Elder Financial Exploitation by a Family Member with a POA is a Known Risk

Nothing pled in this Statement of Claim is a novel or unique situation, except perhaps that an unauthorized person was permitted to transact on Ms. Kraus' account. In fact, the facts alleged herein are well-known patterns

of elder financial exploitation that firms and banks have been told to look out for in senior accounts for decades.

Reg Notice 07-43 is early notice alerting firms that elder financial exploitation is often by a family member:

> Another troubling issue is suspected financial—and sometimes mental or physical—abuse of senior customers by their family members or caregivers. Financial abuse is difficult to define, and therefore, difficult to recognize. In general terms, it is the misuse of an older adult's money or belongings by a relative or a person in a position of trust. Red flags can include sudden, atypical or unexplained withdrawals; drastic shifts in investment style; inability to contact the senior customer; signs of intimidation or reluctance to speak in the presence of a caregiver; and isolation from friends and family.

Firms have been specifically warned to be especially careful when maintaining accounts and processing transactions in senior accounts at <u>the behest of powers of attorney and family members</u>.[45] This troubling scenario with family has repeatedly been echoed over the years before and since Reg Notice 07-43, including:

*Protecting Senior Investors 2015-2020,* FINRA Key Topic, <u>https://www.finra.org/rules-guidance/key-topics/senior-investors/protecting-senior-investors-2015-2020</u> (April 30, 2020)("Sadly, while seniors sometimes fall victim to financial exploitation by strangers, they are <u>often exploited by individuals they know and trust, such as family members</u> or caregivers.")("FINRA 2020 Senior Retrospective").

*Retrospective Rule Review*, Regulatory Notice 19-27 (August 9, 2019)("Recent evidence suggests that financial exploitation of seniors has been increasing, in terms of both magnitude and impact. Although <u>studies indicate that financial exploitation of seniors is often perpetrated by strangers, family members</u> and caregivers—rather than by broker-dealers or other financial services organizations—broker-dealers and other financial services organizations have an important role to play in protecting senior investors." Citing: Consumer Financial Protection Bureau's Office of Financial Protection for Older Americans, *Suspicious Activity Reports on Elder Financial Exploitation: Issues and Trends*, at 18 (Feb. 2019); Statistics and Data on Elder Abuse, The National Center for Elder Abuse, *Who are the Perpetrators*? (DATE)).

FINRA in a November 10, 2020 podcast *Overlapping Risks, Part 2: Anti-Money Laundering and Elder Exploitation* ["Overlapping Risks Podcast"] ("Some of the more common trends that were highlighted in the report involve romance scams, as Brooke pointed out previously, <u>exploitation by a family member or fiduciary</u>…").

---

[45] "The MetLife Study of Elder Financial Abuse," (June 2011). *Available at*: <u>https://ltcombudsman.org/uploads/files/issues/mmi-elder-financial-abuse.pdf</u>.

In FINRA's May 3, 2022 Essential 2165 & 4512 Podcast ("And increasingly, we begin to realize that there are many instances where seniors were victimized not by broker-dealers, but by third parties. <u>Sometimes it's a relative</u>, sometimes a caregiver…")

Adult children and family members are known to be primary culprits of elder financial exploitation, data found at the National Adult Protective Services Association materials from the "Senior Summit"  with the SEC, NASAA and FINRA, as well as others, in September 2008 [FINRA/SEC/NASAA Senior Summit], *Diminished Capacity: What Every Financial Services Professional Should Know* show they historically make up 75% of the exploiters.



(Source: National Center on Elder Abuse 2001)

Morgan Stanley

21

At the FINRA/SEC/NASAA Senior Summit Morgan Stanley provided example questions with obvious answers:

## Scenario #2:   Question 2

**Same scenario, except Roger's son Jim sends in a trading authorization form giving him full authorization on the account, and instructing Matt to have no further contact with Roger. Matt immediately begins noticing checks drawn on the account payable to various high end stores (which have never occurred before) and large amounts of cash funds being transferred to a Morgan Stanley account in Jim's name. Does Matt need to take any action?**

A. Yes. The warning signs that potential elder abuse is occurring exist. Further review is necessary. Matt should immediately escalate this matter to his supervisor and the Field Services Unit of the Legal Department.

Despite FINRA's heightened emphasis on elder financial exploitation in recent years, securities institutions are failing to carry their weight in the detection and prevention of these widespread scams. According to FinCEN, between June 2022 and June 2023, securities and/or futures institutions filed just 4% of the elder financial exploitation-related suspicious activity reports reviewed by FinCEN, significantly trailing the reporting habits of other types of financial institutions[1]:



Clearly, securities firms are dropping the ball on elder financial protection, and it is incumbent on FINRA Arbitration panels to hold these types of firms accountable for their supervisory and compliance failures.

---

[1] "Financial Trend Analysis – Elder Financial Exploitation: Threat Pattern & Trend Information, June 2022 to June 2023," Financial Crimes Enforcement Network, April 2024. *Available at*: https://www.fincen.gov/sites/default/files/shared/FTA_Elder_Financial_Exploitation_508Final.pdf. This study also found that "BSA filers reported **adult children as the perpetrators of elder theft in nearly 40% of cases**," and that such adult children "tended to **live near the parent they were victimizing**" (emphasis added).

**C. Required Supervisory Procedures, Training & Tools: EFE Red Flags**

1. <u>Required Supervisory Plan, Training & Escalation Procedures</u>

It is ***required*** that firms servicing elder accounts develop and maintain a supervisory plan around these vulnerable clients and the transactions in their accounts. To identify elder financial exploitation, brokerage and investment advisory firms must have supervisory procedures addressing elder financial exploitation and must train financial professionals (a) to spot it, (b) what to do if suspected; and (c) to go to clear reporting line procedures. Firms must use their technological tools to identify elder financial exploitation. As stated in the FINRA 2020 Senior Retrospective, FINRA notes the importance of the use of technological tools to root out elder financial exploitation:

> ▶ **Account Monitoring**—Firms leveraged advanced technologies to detect, prevent and predict potential diminished capacity or financial exploitation in senior investor accounts, including specialized senior investor-focused or existing fraud detection, anti-money laundering or Bank Secrecy Act account monitoring, surveillance reviews and exception reports, including but not limited to, those that focused on:
> - Transaction types that are inconsistent with prior account activity, such as wiring money out of an account or not paying regular bills;
> - Decreasing account balances; and
> - Access failures or access for new individuals or from new locations.

In a June 27, 2023, podcast at FINRA *Preventing Financial Exploitation: Steps for Safeguarding Senior Investors*, FINRA explains the industry's role, including "<u>ability to observe behaviors, red flags ..... suspected financial exploitations</u>" in account reviews, conversations with customers and using technological "<u>tools</u>" to identify patterns. [46] It goes on to discuss the need for "<u>formal escalation procedures</u>, implementing and training

---

> ### 3. The Role of Technology in Enhancing AML Efforts
>
> 🏷 Role of Technology in Enhancing
>
> In the intricate <u>world of financial regulation</u>, technology stands as a beacon of progress in the <u>fight against money laundering</u>. The advent of sophisticated software and analytical tools has revolutionized Anti-Money Laundering (AML) efforts, enabling institutions to navigate the murky waters of compliance with greater agility and precision. From the implementation of complex algorithms that detect unusual patterns of behavior to the deployment of <u>machine learning models</u> that predict potential risks, technology has become an indispensable ally in the quest to uphold the integrity of the financial system.
>
> 1. Automated Transaction Monitoring: Financial institutions traditionally relied on manual scrutiny of transactions, a process fraught with inefficiencies and prone to human error. Now, automated systems can monitor <u>transactions in real-time</u>, flagging those that appear suspicious. For example, if a customer who typically makes small, local transactions suddenly starts transferring large sums overseas, the system would alert compliance officers to investigate further.

46

reps to use a comprehensive process to escalate issues related to seniors, including concerns about financial exploitation." (13:38-15:05) In fact, AML Officers will oft implement new surveillance when new types of red flags are identified.

Despite all these measures, as well as perhaps because of the open discussion, taking the guilt out of victims, numbers are not going down and firms must be diligent in developing and enforcing their supervisory procedures, especially frequent training of their front line staff:

> Similarly, member firms report that there is an increase in reporting potential elder financial exploitation shortly after associated persons receive training regarding red flags. Member firms have indicated these reports may decline over time and increase again after another training. This highlights the importance of regular educational interventions for member firm associated persons as well.

2.  Recognition of the Risks with Powers of Attorney & the Elderly

The industry recognizes the problems associated with powers of attorneys and guardians. Even if agents under a power of attorney are allowed to make financial decisions, firms cannot be complacent because financial exploitation can still occur. As Wells Fargo's Director of Elder Client Initiatives Robert Long recognized, some agents "rather than using the money for the benefit of the elderly client, take[] advantage and use[] it for themselves." Mark Abrams, *Wells Fargo Aims to Solve Rise in Elder Financial Abuse*, CBS Philly (July 14, 2015), http://philadelphia.cbslocal.com/2015/07/14/wells-fargo-aims-to-solve-rise-in-elder-financial-abuse/. Because of the possibility of exploitation, 86% of advisors monitor accounts once an agent under power of attorney takes over. *See* Naomi Karp & Ryan Wilson, *Protecting Older Investors: The Challenge of Diminished Capacity*, AARP Public Policy Institute, note 17 at 26 (Nov. 2011).[47]

3.  Red Flags of Elder Financial Exploitation

As stated above, elder financial exploitation is often undertaken by a family member and these accounts themselves are high risk accounts that need monitoring.  At the FINRA/SEC/NASAA Senior Summit, Morgan

---

https://www.fastercapital.com/content/AML--Anti-Money-Laundering---Navigating-the-Waters-of-Compliance--AML-Strategies-in-the-KYC-Process.html

[47] ttp://www.aarp.org/content/dam/aarp/research/public_policy_institute/cons_prot/2011/rr2011-04.pdf.

Stanley in its join presentation with the SEC, NASAA and FINRA prepared procedures for "Working with Seniors" noting the following "**RED FLAGS**" of elder financial exploitation:



## Red flags of potential financial exploitation

- o  Uncharacteristic and repeated cash withdrawals or wire transfers.
- o  Appearing with new and unknown associates, friends, or relatives.
- o  Uncharacteristic nervousness or anxiety when visiting the office or conducting telephonic transactions.
- o  Lacking knowledge about his, her, or their financial status.
- o  Having difficulty speaking directly with the client or customer without interference by others.
- o  Unexplained or unusual excitement about an unexplained or "too good to be true" windfall; reluctance to discuss details.
- o  Sudden changes to financial documents such as powers of attorney, account beneficiaries, wills, or trusts.
- o  Large, atypical withdrawals or closing of accounts without regard to penalties.
- o  Frequent password reset requests or new online account access requests.

Copyright 2023 FINRA                                                              13

Echoed by many regulators, "***uncharacteristic and repeated cash withdrawals or wire transfers***," "[s]udden changes to financial documents such ***as powers of attorney***, account beneficiaries, wills or trusts," and "***[l]arge, atypical withdrawals or closing of accounts*** without regard to penalties" are commonly red flags of EFE. NASAA also includes "[l]arge loans or ***gifts*** made without regard to financial security," "[m]aking ***unexplained decisions that are not in the protected individual's best interest***."[48]  NASAA informed investors and the industry:

---

[48] See *Understanding and Preventing Financial Exploitation of Vulnerable Older Adults*, Office Of the Statewide    Coordinating    Judge    for    Family    Violence    Cases    (Nov.    2017) ww2.nycourts.gov/sites/default/files/document/files/2018-09/monograph.pdf



**Guarding the Guardians**

**The Red Flags of Guardian Financial Abuse**

*A trusted guardian can be a wonderful resource. But sometimes guardians may take advantage of the people or assets in their care. Be aware of the red flags of guardian financial abuse.*

### What is a Guardian?

A guardian manages the day-to-day financial affairs of an individual who is no longer able to do so for him or herself.

A guardian is a person or entity appointed by a court to exercise some or all authority over a person and/or estate. A guardian has power to make decisions related to the health and safety of the incapacitated person. A guardian of an estate, often referred to as a conservator, has authority over the financial affairs.

Guardians have a legal obligation to act in a protected individual's best interest. A guardian for the protected individual may be a public guardian funded by a state or local government, a professional private guardian, a family member, neighbor, attorney, accountant, investment adviser, insurance producer, or some other financial professional. Guardians often are granted extensive access to the protected individual's assets and control over how those assets will be used.

### What is Guardian Financial Abuse?

Financial abuse by guardians occurs when a guardian improperly uses a protected individual's funds, securities, property, or other assets.

For example, a guardian takes money from a protected individual's investment portfolio to buy a flashy car for the guardian's personal use.

### Red Flags that a Protected Individual is Being Abused:

- No explanation for large account withdrawals.
- No awareness or understanding of guardian's financial decisions.
- Large loans or gifts made without regard to financial security.
- Social isolation.
- Total dependence on the guardian.
- Noticeable neglect or decline in appearance, grooming, or hygiene.
- Unusual degree of fear, anxiety, submissiveness or deference towards guardian.

### Red Flags that a Guardian is Abusing Protected Individuals:

- Using guardianship authority to transfer property for guardian benefit.
- Receiving personal payments from protected individual without court permission.
- Authorizing frequent cash withdrawals from the protected individual's accounts without explanation.
- Using or borrowing property for personal benefit without court authorization.
- Being overly secretive about the protected individual's finances.
- Depending on the protected individual's personal finances.
- Making unexplained decisions that are not in the protected individual's best interest.
- Isolating the protected individual.

### What can you do if you Suspect Guardian Financial Abuse?

Contact appropriate authorities, such as police, Adult Protective Services, state or provincial financial services regulators, or other government agencies with authority to stop guardian financial abuse.



**North American Securities Administrators Association**
To learn more about this issue, contact your state or provincial securities regulator. Contact information is available on www.nasaa.org.

*See also*, Essential 2165 & 4512 Podcast "[i]t could be circumstances where the customer's trading or disbursement patterns are significantly different than anything the customer has ever done in the past. And so **those are the types of red flags that firms have seen, and they follow up with an investigation**."

FINRA 2020 Senior Retrospective reminds members that "[o]ver the past decade, FINRA issued a number of Regulatory Notices emphasizing firms' ***obligations*** to senior investors and providing guidance on ***how to fulfill those obligations***." See, e.g., Regulatory Notice 07-43 (FINRA Reminds Firms of Their Obligations Relating to Senior investors and Highlights Industry Practices to Serve These Customers)(Emphasis added); Regulatory

56

Notice 09-42 (FINRA Reminds Firms of Their Obligations With Variable Life Settlement Activities); Regulatory Notice 11-52 (FINRA Reminds Firms of Their Obligations Regarding the Supervision of Registered Persons Using Senior Designations); Regulatory Notice 16-12 (FINRA Provides Guidance on Firm Responsibilities for Sales of Pension Income Stream Products); Regulatory Notice 17-11 (SEC Approves Rules Relating to Financial Exploitation of Seniors); Regulatory Notice 20-38[49]; Regulatory Notice 22-05; and Regulatory Notice 22-31. FINRA further noted in FINRA 2020 Senior Retrospective that "senior investor issues have been an examination priority in every FINRA annual priorities letter since 2014." That sentiment written in 2020 is still true to date.

The FINRA/SEC/NASAA Senior Summit indicates the following could have and should have been done in following appropriate supervisory procedures:



FINRA also highlights issues with implementation again highlighting the importance of strong and implemented procedures.

---

[49] Regulatory Notice 20-38 notified the public of FINRA's adoption of new Rule 3241, which limited a registered person's ability to be named "a customer's beneficiary or **holding a position of trust for** or on behalf of **a customer**," this includes holding a power of attorney, as indicated by the notice.

Although Rule 3241 does not specifically apply to immediate familial relationships and attempts to prevent conflicts of interest in the context of registered persons associated with the same member firm at issue, the policy behind establishing the rule is relevant here as FINRA is continuing to expand its protection of senior investors. First, the notice highlights that, "Senior investors who are isolated or suffering from cognitive decline are **particularly vulnerable to harm**." Second, the notice indicates that under the new Rule 3241, the registered person is to "**not derive financial gain** from acting in such capacity…"

> ## V. Effective Practices from Firms' Senior Investor Protection Programs
>
> In 2019, FINRA assessed firms' senior investor protection programs, including their implementation of the FINRA Senior Exploitation Rules. In particular, FINRA evaluated how firms addressed risks relating to senior investors in their policies and procedures; gathered trusted contact person information; developed training relating to senior investors; implemented systems to escalate financial exploitation concerns; placed holds on disbursements in customer accounts; conducted senior investor exploitation investigations; and reported instances of financial exploitation. [50]

With pride, FINRA tells stories in the FINRA 2020 Elder Retrospective of how FINRA Rule 2165 properly executed through supervisory procedures, implementation, training and tools can have the intended cessation of elder financial exploitation involving family members:

> **Firm's Temporary Hold Protects Senior Investor from Concerning Investments**
>
> The daughter of a senior investor requested a disbursement from her father's account for $35,000 to invest in an offering to build an overseas solar panel energy field and the customer agreed to the disbursement. The firm placed a temporary hold on the disbursement and conducted research and due diligence on the offering, which raised concerns about the legitimacy of the company, the claimed high rate of return and promises to return the customer's investment in 60-90 days. The firm also referred the matter to relevant regulators to further review the offering.

> **Helpline Assists Firm With Temporary Hold to Protect Senior Investor from Losing $50,000 to Financial Exploitation from His Brother-in-Law**
>
> A brother-in-law of a senior investor called the Helpline, stating that the senior investor's firm had "frozen" the senior investor's account so the senior investor could not get access to $50,000 the senior investor needed for medical treatment. After the Helpline staff contacted the senior investor, he revealed that he needed the $50,000 to pay his brother-in-law a $10,000 per month retainer as his attorney and to invest in a movie deal his brother-in-law found. Helpline staff contacted the firm, which had placed a temporary hold on the disbursements because it was concerned their customer was being financially exploited. Helpline staff then called the state's APS, which conducted a wellness check on the senior investor. Helpline staff referred the matter to the state securities regulator and local criminal authorities.

*Id* at 12-13. FINRA 2020 Senior Retrospective's similar "suitability" analysis relating to "Know Your Customer" rules, linking it to exploitation and highlighting need for strong written supervisory procedures, clear

---

[50] FINRA, the SEC and NASAA noted overlapping obligations with only a SAR being not enough:

> ## Suspicious Activity Reports ("SARs")
>
> ○ Broker-Dealers must file SARs whenever they encounter certain suspicious activity.
> ○ When filing a SAR for that purpose, remember to check the Elder Exploitation Box on the form (FIN-2011-A003).
> ○ SAR filings are not a substitute for local reporting and investigation.

reporting escalation and training on financial exploitation red flags:

> ► **Escalation Process**–Firms implemented—and trained registered
> representatives to use—a comprehensive process to escalate issues relating
> to senior investors, including but not limited to concerns about financial
> exploitation, diminished capacity or cognitive decline.
>
> ► **Training on Financial Exploitation and Diminished Capacity Red Flags**–
> Firms developed FINRA Senior Exploitation Rules training[24] for registered
> representatives via interactive, video-based or in-person sessions, as well as
> ongoing, regular reminders that included spotting and responding to red flags
> of financial exploitation, diminished capacity or cognitive impairment in their
> clients.

In fact, FINRA mentioned firm support for FinTech tools that identify:

> ► **FinTech Tools**–Firms supported senior investors' use of vendor tools that:
>
> • Highlight potential instances where a senior investor is at risk for poor
> financial decision-making or exploitation, and facilitate collaboration
> on financial decisions with trusted individuals; and
>
> • Monitor alerts relating to any concerning or inconsistent financial activity,
> contact trusted individuals and assist with remediation efforts.

FINRA also mentioned effective practices include:

> ► **Removing Trusted Contact Persons**–Firms advised registered representatives
> that they should not reach out to trusted contact persons who have been
> removed by the customer or those that the registered representative
> reasonably believes may be engaging in financial exploitation of the customer.

*Id*.

    4.   <u>EFE Conduct in Senior Safe Act, FINRA & SEC Rules, State & AML Laws Since 1970</u>

    In the overlapping obligations between anti-money laundering ("AML") and elder financial exploitation

laws, in FINRA's Overlapping Risks Podcast it addressed this and emphasized that:

02:55 - 03:07

Kaitlyn Kiernan: On our last episode, we talked about there's not necessarily an intuitive overlap between seniors and anti-money laundering or AML. How much do these topics overlap?

03:07 - 03:49

Brooke Hickman: I would agree that at first blush, it doesn't really seem that these topics would overlap. And I know that there's been a previous podcast discussing how fraud and AML overlap, but I think in this instance, it's helpful to think first about the risk of other financial exploitation in general. Older Americans obviously represent a high concentration of wealth as compared to the overall population. Some may be relying on others for their physical well-being and financial management duty, their cognitive or physical decline. And as a result, certain elderly individuals may be particularly vulnerable to financial crimes such as identity theft, embezzlement or other fraudulent schemes.

03:50 - 05:18

Jason Foye: Yeah, financial institutions, including FINRA member broker-dealers, play a critical role in addressing elder financial exploitation, both from a compliance and AML perspective. A big reason for that is just by the nature of the client relationship and information collected through AML rules and regulations. Financial institutions have a familiarity with their elder customers and what is expected in those accounts that can enable the financial institutions to identify red flags of suspected financial exploitation and to alert the appropriate authorities through, amongst other reporting obligations, the filing of suspicious activity reports, or SARs.

And we really can't overstate the usefulness of SAR information and the ability to generate leads for federal, state and local law enforcement in this area, as well as their ability to inform regulatory agencies such as the Consumer Financial Protection Bureau or CFPB, the SEC, and FINRA as well, where the analysis of these SARs can enable these agencies to really understand critical intelligence about the specific frauds or trends and typologies that are being used to target these vulnerable customers and to really address and mitigate this threat.

05:19 - 05:28

FINRA further discussing **red flags**:

07:39 - 07:50

Kaitlyn Kiernan: That's always horrible to hear. Why is it important for broker-dealers to think about their senior investor protection program and their AML program more holistically?

07:51 - 08:18

Brooke Hickman: So many of the red flags of an AML program are the same as the red flags of potential financial exploitation. So, whether it be excessive, unsuitable or unusual trading, uncharacteristic and repeated cash withdrawals or wire transfers, large atypical withdrawals, the closing of accounts or surrendering of annuities without regard to penalties, these are all things that could potentially flag in an AML program.

08:18 - 09:31

Jason Foye: And as a result, it's critical that financial institutions be aware of these overlapping risks and how the red flags can lead them to detecting and reporting on suspected elder financial exploitation. So what this means is if a firm is investigating potential elder financial exploitation through the compliance side of the firm, they need to make sure that they're also considering the AML aspects of their responsibilities in that space in terms of the review and potential filing of a SAR. Conversely, if a firm is reviewing red flags of suspicious activity and the activity involves an elderly customer of the firm, they also want to make sure that they're considering whether there is a risk that the activity is not just unusual or potentially suspicious, but also that it may involve potential elder financial exploitation.

And as with any suspicious activity review, no single red flag is necessarily going to be indicative of elicit or suspicious activity and financial institutions really should consider the full fact pattern specific to the individual customer and their historical transactions when reviewing the potential red flag to determine if a SAR is warranted.

10:55 – 13:11

> while there's a number of specific and detailed red flags in the advisory that the audience should take a look at, they tended to fall into two broader categories. The first being erratic or unusual withdrawal activity by the customer, or changes in the banking patterns that may indicate a loss of funds or a loss of access to funds. And the second being unusual interactions with the customer or the customer's caregiver during servicing of the accounts.

> 19:40 - 20:24
>
> Brooke Hickman: While there are certain red flags in terms of activity in the customer's account that an AML department may be in the best position to detect, there is other red flags based on interactions with the customers that areas of the firm who are on the front line will likely be in the best position to detect. So, it's an area where effective communication throughout the organization is crucial to make sure that folks in compliance and in the business are aware of what red flags need to be escalated to AML for further review. And firms will also want to make sure that they're reasonably testing to ensure that the red flags they expect to be escalated are actually being escalated and the process is working as designed.

*Id.*

## D. Another Shocking Issue With Respect To Schwab

Shockingly, Schwab attempts to indemnify itself against failing to satisfy its mandatory reporting requirements in 39 states by embedding in its agreements the following phrase:

> You authorize us to place a temporary hold on disbursements of funds or securities from your account or, in some cases, a temporary hold on transactions if Schwab reasonably believes financial exploitation has been attempted or has occurred in your account or in other circumstances we believe are necessary for your protection. You also acknowledge that we may report any reasonable belief of financial exploitation, or in other circumstances we believe are necessary for your protection, to the applicable state securities administrator, to a state adult protective services agency, or to law enforcement agencies.
>
> Providing Schwab with a TCP does not ensure that financial exploitation will not be attempted or occur. You agree to indemnify and hold harmless Schwab, its affiliates, and their directors, officers, employees, and agents from and against all claims, actions, costs, and liabilities, including attorney's fees, arising out of or relating to: Schwab contacting your TCP; Schwab putting a temporary hold on disbursements of funds and/or securities from your account; and Schwab not contacting your TCP or placing temporary holds on disbursements of funds and/or securities from your account.

Schwab is a brokerage firm and is not permitted under FINRA Rules 2268 and 2010, to pre-indemnify itself in customer agreements for failing to engage in mandatory reporting. Schwab was particularly well positioned to

see the fraud through red flag reporting and the sophisticated technological tools it maintains that would identify over $8 Million depleted in large withdrawals in an 84 year old's account in a short period of her long life. Firms like Schwab are not exempt from mandatory state reporting and putting pauses on client transactions/withdrawals. As "FINRA Reminds Members About Requirements When Using Predispute Arbitration Agreements for Customer Accounts" Regulatory Notice 21-16 (April 21, 2021).

---

## Indemnity and Hold Harmless Provisions

Some customer agreements contain indemnification or hold harmless provisions, such as broad provisions that require that the customer indemnify and hold harmless the member firm from all claims and losses arising out of the agreement. Indemnification and hold harmless provisions do not comply with FINRA Rule 2268 where the provisions, if given effect, would limit the customer from bringing a claim or receiving an award from the member firm or associated person that they would otherwise be entitled to receive. For example, an indemnification and hold harmless provision that could be invoked to assert that a customer could not bring a claim alleging a failure to supervise against a member firm that the customer would otherwise be entitled to bring under applicable law would not comply with FINRA Rule 2268.

In addition, a well-developed line of case law has held that it is contrary to public policy for a person to seek indemnity from a third party for that person's own violation of the federal securities laws.[17] Accordingly, FINRA believes that it would be unethical and not in compliance with FINRA Rule 2010 for a member firm or associated person to attempt to seek indemnity from customers of costs or penalties resulting from the firm's or associated person's own violation of the securities laws or FINRA rules.[18] For example, FINRA believes that a member firm would violate FINRA Rule 2010, and be subject to disciplinary action, if it sought to recover from a customer the attorney's fees that it incurred as a result of a regulatory investigation into the member firm's own misconduct.

---

https://www.finra.org/rules-guidance/notices/21-16. *See also quoted in above, First Golden Bancorporation v. Weiszmann*, 942 F.2d 726, 728-29 (10th Cir. 1991) (describing how "[c]ourts have rejected indemnity for a variety of securities violations because indemnity contravened the public policy enunciated by the federal securities laws") (citations omitted). FINRA spokeswoman, Michelle Ong, from an article published in the NY Times stated: "Indemnification clauses do not shield firms from their legal and regulatory obligations to comply with federal securities laws and FINRA rules," and "[t]he use of any clause or tactic designed to intimidate or keep a customer from exercising his/her right to proceed in arbitration would violate FINRA conduct rules and we may investigate the use accordingly." Susan Antilla, Brokers Countersue to Thwart Suits by Unhappy Investors, N.Y. TIMES, Sept. 18, 2014, at B8, available at http://dealbook.nytimes.com/2014/09/17/brokers-countersue-to-thwart-suits-by-unhappy-investors/?_php=true&_type=blogs&_r=0 (last visited July 24, 2024).

E. **Arbitrators Since the 1990s Held Firms Responsible for EFE**

What we can glean from reasoned and unreasoned arbitration awards before and after many of these standards began is that arbitrators are holding firms accountable for failures to supervise and report these accounts to stop the exploitation from occurring, enabling criminals as a financial intermediary. Reasoned and unreasoned awards for theft and elder financial exploitation are not new, despite regulators' late attention to the matter.

Schwab was found liable in *John D. Wee v. Charles Schwab & Co., Inc.*, 04-07655 (NASD 5/25/06) a case involving damages in an UTMA custodial account as a "securities intermediary" in the taking of personal property by the custodian and breach of fiduciary duty.

UBS liable for theft from a brokerage account: Carl Cosio v. UBS, et al., 09-05793 (FINRA Oct. 4, 2011).

In a case involving an 85-year-old afflicted with Alzheimer's disease and her younger 77 year-old sister, Claimants received full awards, **treble damages** and interest, as well as all costs in *Daisy Wilson & The Estate of Emma Grant v. Marc Jay Berman and Aragon Financial Services, Inc.*, Case No. 94-01401 ((February 18, 2017). Claimants were found to be "of diminishing capacity," granted the "presumption of undue influence," the subject of defalcation,[51] improper gifting of their assets and theft.

In another reasoned award, *Karen K. Fry and Sally A. Baker, as Successor Co-Trustees of the Belva Jeanne Shultz Revocable Trust (BJST), et al. v. First Clearing, Thornes, John Thomas et al.*, Respondent Thornes & Associates, Inc. Investment Securities (TAIS), 13-01837 (FINRA1/2/2015) found that Thornes "as trustee of the BJST, was obligated to Ms. Shultz (beneficiary of the BJST) and to said trust in a fiduciary capacity and while acting in such capacity committed fraud and/or defalcation thereby causing damage….[and] engaged in the wrongful taking, concealing and/or disposition of trust property…[and] engaged in financial abuse of an elder person…]" awarding double and **treble damages** to different causes of action, in total $4,525,116 plus interest.

---

[51] Defalcation is a synonym for embezzlement and refers to someone who has legally required financial duties and misuses or misappropriates funds. Defalcation often arises regarding trustees or fiduciaries in their jobs regarding estate or corporate funds. https://www.merriam-webster.com/dictionary/defalcation

In *Mark A. Schroeder v. Wells Fargo Advisors, et al.*, 15-00074 (FINRA 15-00074) Wells Fargo was held fully responsible for the full amount of the loss after changing a client's address on an IRA at the request of an ex-wife without proper authorization.

In *Myrna Wechsler et al vs. Raymond James Financial Services, et al.*, 10-04291 (FINRA October 2, 2012), Raymond James Financial Services (RJFS) was specifically held jointly and severally liable with other Respondents for exploitation of an elderly person in violation of Florida Statute 825.103 for $800,000 and RJFS was also solely liable to pay compensatory damages of $265,000 plus interest.

In *Andrea McMillan v. Newbridge Securities Corporation, Merrill Lynch et al.* 12-01880 (FINRA 6/10/2013), a case spanning both Florida and New York about amongst other things exploitation of elderly persons, civil theft and conversion, as well as involving a power of attorney, the brokerage firms settled their cases and the remaining individual defendants were found liable for exploitation of elderly persons, civil theft and conversion. The causes of action relate to Claimant Andrea McMillan's alleged breach of duties owed to Claimant Joan McMillan as power-of-attorney for Claimant Joan McMillan's accounts.

In a case involving the theft of cash and unspecified securities deposited in Claimant's account held by, and in the custody of, Wells Fargo, a panel ordered Wells Fargo to pay $2,752,049 (which included prejudgement interest and costs). In its finding, the Panel based their decisions on common law claims, quoting a relevant case:

> See Gilson v. TD Bank, NA, 2011 U.S. Dist. Lexis 7805, 73 UCC Rep. Serv. 2d (Callaghan) 430; 2011 WL 294447 quoting Regions Bank v. Provident Bank Inc., 345 F.3d 1267,1275 (if*" Cir. 2003) "[T]he only restraint on a plaintiff [seeking to redress an alleged harm arising from a funds transfer] is that resort to principles of law or equity outside of [the statute] is not appropriate to create rights, duties and liabilities inconsistent with those stated in this article." (emphasis in original).

In *Ryan Peter Trottier, executor, et al. v. Morgan Stanley Smith Barney LLC dba Morgan Stanley, et al.*, 15-02910)(FINRA 6/9/17) Morgan Stanley was required to pay $396,623 in compensatory damages for aiding and abetting a third party's financial exploitation of the Claimant.

In *Anne C. Grey v. Stern, Agee & Leach, Inc.*, 16-01784 (FINRA March 22, 2019) Stern Agee & Leach, Inc. was held liable $400,000 for wire and other transfers in a misappropriation case involving failure to get appropriate signatures for the transfers.

In Sharon Sauls POA/Ella Sather v. Sutro & Company, et al, 97-04181 (NASD Nov. 6, 1998), Sutro & Company was held liable for unauthorized withdrawals from an account for the sole purpose of misappropriating funds, in negligence and conversion, including forgeries.

There is no reason for this Panel not to aid the securities industry in rooting out, preventing and making an example of brokerage firms for not protecting our seniors by awarding **$8,427,000** full compensatory damages, costs, interest and attorneys' fees.


## VIII.   CAUSES OF ACTION

## N.   NEGLIGENCE

(All Respondents)

Failure to follow industry rules, regulations and laws is a breach of duty of care and negligence.

8.   Recklessness, Gross Negligence, and Ordinary Negligence


Here, Respondents owed Ms. Kraus duties under acceptable industry standards and acted negligently. Failure to abide by and comply with SEC, FINRA, NASAA , and relevant state laws and rules cited above and incorporated by reference provide evidence of breach of the duty of care owed to customers by broker-dealers.

The elements of negligence are (1) a legal duty owed by defendant to plaintiff, (2) breach of that duty by defendant, (3) an injury to plaintiff legally caused by defendant's breach, and (4) damages resulting from the injury.[52]   Proximate cause of a negligence action is established if there is "a natural, direct and continuous sequence between the negligent act [or omission] and the [plaintiff's] injury that it can be reasonably said that but for the [negligent] act [or omission] the injury would not have occurred." [53]

---

[52] *Paterson v. Deeb*, 472 So. 2d 1210 (Fla. Dist. Ct. App. 1985).

[53]   *Tieder v. Little*, 502 So. 2d 923, 925 (Fla. Dist. Ct. App. 1987) (At the outset, the 'proximate cause' element of a negligence action embraces, as a sine qua non ingredient, a causation-in-fact test, that is, the defendant's negligence must be a cause-in-fact of the plaintiff's injuries. Generally speaking, Florida courts have followed a

In failing to implement policies and technological tools, enforce the same and train employees on appropriate policies and procedures designed to ensure that its elders were not exploited, Respondents undoubtedly breached their and her duties owed. Respondents' lax supervision, and by extension their breach of duties, was a substantial factor in Ms. Kraus' financial injuries. Furthermore, Respondents' behavior was a grossly negligent and reckless  departure from the traditional and legally obligated standard of care." A defendant would be liable for gross negligence, and not just "simple negligence" if the actor engaged in "a conscious and voluntary act or omission which is likely to result in grave injury when in the face of a clear and present danger of which the alleged tortfeasor is aware.[54]

9. <u>Negligent Failure to Supervise and Respondeat Superior</u>

Under FINRA Rule 3110, Respondents are required to "establish and maintain a system to supervise the activities of each associated person that is reasonably designed to achieve compliance with applicable securities laws and regulations, and with applicable FINRA rules." This includes creating, maintaining and enforcing policies and procedures, as well as adequately and effectively training all staff on said policies and procedures.

At a minimum, member firms must establish and maintain written procedures, designate appropriately registered principals and compliance professionals, as well as an individual at each branch office, to carry out supervisory responsibilities, and assign each registered person to a supervisor whom the member has used reasonable efforts to determine is qualified to undertake supervisory responsibilities. Importantly, "final responsibility for proper supervision shall rest with the member." *FINRA Rule 3110. Supervision.*

(Continue to next page)

---

'but for' causation-in-fact test, that is, 'to constitute proximate cause there must be such a natural, direct and continuous sequence between the negligent act [or omission] and the [plaintiff's] injury that it can be reasonably said that but for the [negligent] act [or omission] the injury would not have occurred.'")
[54] Elec. Boat Corp. v. Fallen, 343 So. 3d 1218 (Fla. Dist. Ct. App. 2022).

## O. **BREACH OF STATE &  FEDERAL LAWS**

(All Respondents)

10. Elder Financial Exploitation in Florida

Florida is a mandatory elder financial exploitation reporting state. Mr. Graham perpetrated the fraudulent scheme discussed herein, which was ratified by Respondent firms failing to monitor and/or report his misconduct, most of which occurred while he resided in Florida.

**415.1034 Mandatory reporting of abuse, neglect, or exploitation of vulnerable adults; mandatory reports of death.—**

(1)    MANDATORY REPORTING.—

(a)    Any person, including, but not limited to, any:

……………..

9.    Dealer, investment adviser, or associated person under chapter 517,

who knows, or has reasonable cause to suspect, that a vulnerable adult has been or is being abused, neglected, or exploited must immediately report such knowledge or suspicion to the central abuse hotline.

(b)    To the extent possible, a report made pursuant to paragraph (a) must contain, but need not be limited to, the following information:

1.    Name, age, race, sex, physical description, and location of each victim alleged to have been abused, neglected, or exploited.

2.    Names, addresses, and telephone numbers of the victim's family members.

3.    Name, address, and telephone number of each alleged perpetrator.

4.    Name, address, and telephone number of the caregiver of the victim, if different from the alleged perpetrator.

5.    Name, address, and telephone number of the person reporting the alleged abuse, neglect, or exploitation.

6.    Description of the physical or psychological injuries sustained.

7.    Actions taken by the reporter, if any, such as notification of the criminal justice agency.

8.    Any other information available to the reporting person which may establish the cause of abuse, neglect, or exploitation that occurred or is occurring.

Florida also prioritizes the protection of specified adults, which Ms. Kraus falls under because she is both over 65 years old and a vulnerable adult[55] due to her declining mental capacity and related cognitive issues. Respondents should have taken special protection of Ms. Kraus.

**517.34 Protection of specified adults. –**

(1)    As used in this section, the term:

**(a)    "Financial exploitation" means the wrongful or unauthorized taking, withholding, appropriation, or use of money, assets, or property of a specified adult; or any act or omission by a person, including through the use of a power of attorney, guardianship, or conservatorship of a specified adult, to:**

**1.    Obtain control over the specified adult's money, assets, or property through deception, intimidation, or undue influence to deprive him or her of the ownership, use, benefit, or possession of the money, assets, or property; or**

**2.    Convert the specified adult's money, assets, or property to deprive him or her of the ownership, use, benefit, or possession of the money, assets, or property.**

(b)    "Specified adult" means a natural person 65 years of age or older, or a vulnerable adult as defined in s. 415.102.

(c)    "Trusted contact" means a natural person 18 years of age or older who the account owner has expressly identified and who is recorded in a dealer's or investment adviser's books and records as the person who may be contacted about the account.

(2)    **The Legislature finds that many persons in this state, because of age or disability, are at increased risk of financial exploitation and loss of their assets, funds, investments, and investment accounts.** The Legislature further finds that senior investors in this state are at a statistically higher risk of being targeted for financial exploitation, regardless of diminished capacity or other disability, because of their accumulation of substantial assets and wealth compared to younger age groups. In enacting this section, the Legislature recognizes the freedom of specified adults to manage their assets, make investment choices, and spend their funds, and intends that such rights may not be infringed absent a reasonable belief of financial exploitation as provided in this section. The Legislature therefore intends to provide for the prevention of financial exploitation of such persons. **The Legislature intends to encourage the constructive involvement of securities dealers, investment advisers, and associated persons who take action based upon the reasonable belief that specified adults with investment accounts have been or are the subject of financial exploitation, and to provide securities dealers, investment advisers, and associated persons immunity from liability for taking actions as**

---

[55] A "Vulnerable adult" defined under § 415.102 (28) is a " person 18 years of age or older whose ability to perform the normal activities of daily living or to provide for his or her own care or protection is impaired due to a mental, emotional, sensory, long-term physical, or developmental disability or dysfunction, or brain damage, or the infirmities of aging."

**authorized herein.** The Legislature intends to balance the rights of specified adults to direct and control their assets, funds, and investments and exercise their constitutional rights consistent with due process with **the need to provide securities dealers, investment advisers, and associated persons the ability to place narrow, time-limited restrictions on these rights in an effort to decrease specified adults' risk of loss due to abuse, neglect, or financial exploitation.**

Based on the foregoing statutory provisions and the misconduct described herein, Respondent firms failed to report on or protect Ms. Kraus from the fraudulent scheme run by her own adult son.

11. Florida Investor Protection Act, Florida Statute § 517.301

Section 517.301 of the Florida Investor Protection Act is Florida's antifraud statute. Subsection (1)(a) states that it is unlawful for a person offering investment advice to "employ any device, scheme, or artifice to defraud"[56] and "[t]o engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a person."[57] This provision also prohibits any person advising on investment matters from obtaining "money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."[58] The statute provides for a private right of action to any person injured by such deceptive acts or practices, placing no restriction on investors bringing a civil action against an adviser.[59] The act also explicitly and liberally allows investors to recover full compensatory damages, statutory interest, rescission where applicable (i.e., for non-liquid securities), and reasonable attorney's fees.

(Continue to next page)

---

[56] Fla. Stat. Ann. § 517.301(1)(a)1.

[57] Id. § 517.301(1)(a)3.

[58] Id. § 517.301(1)(a)2. The language in 517.301(1)(a)1-3 is modeled after SEC regulation 17 C.F.R. § 240.10b-5, which makes it illegal for any person to defraud or deceive someone, including through the misrepresentation of material information, with respect to the sale or purchase of a security.

[59] See id. § 517.241(2) – Remedies: "Nothing in this chapter limits any statutory or common-law right of a person to bring an action in a court for an act involved in the sale of securities or investments, or the right of the state to punish any person for a violation of a law."

12. New York Blue Sky Laws

In New York state, Courts have interpreted that the Martin Act, codified by New York General Business Law § 352 and 352-C, prohibits "all deceitful practices contrary to the plain rules of common honesty." *People v. Federated Radio Corporation*, 244 N.Y. 33, 38-39 (1926); *see also People v. Wachtell*, 181 Misc. 1010, 1011, 47 N.Y.S.2d 945, 946 (Sup. Ct. N.Y. Co. 1943). Further, the act specifically prohibits fraud:

> 1. It shall be illegal and prohibited for any person...to use or employ any of the following acts or practices:
>> (a) Any fraud, deception, concealment, suppression, false pretense or fictitious or pretended purchase or sale…

GEN. BUS. LAW § 352-c(1).

Further, it prohibits the obtaining of money, profit, or property, by any of the fraudulent conduct outlined in the act:

> 2.   It shall be illegal and prohibited for any person, partnership, corporation, company, trust or association, or any agent or employee thereof, to engage in any artifice, agreement, device or scheme to obtain money, profit or property by any of the means prohibited by this section.

*Id*. at § 352-c(2).

Here, Respondents allowed and continued to ratify Mr. Graham's fraudulent scheme in using deceitful practices to obtain money from Ms. Kraus' accounts, both managed and supervised by the Respondents. Therefore, the conduct described herein would be considered actionable fraud.

13. New York Civil Financial Exploitation

Under New York state's Social Services Law, social service offices are expected to offer services to individuals subject to financial exploitation. *See* New York Consolidated Laws, Social Services Law - SOS § 473. Protective services. "Financial Exploitation" is defined as:

> [the] improper use of an adult's funds, property or resources by another individual, including but not limited to, fraud, false pretenses, embezzlement, conspiracy, forgery, falsifying records, coerced property transfers or denial of access to assets.

Here, Mr. Graham continually financially exploited Ms. Kraus by taking control of her accounts and converting upwards of $8 million for his sole benefit. The Respondent firms should have supervised the suspicious activity in the accounts and prevented the fraud from occurring, or at the very least, stopped it upon discovery, to

mitigate the financial harm. However, the Respondent firms failed to supervise, act, or report, to Ms. Kraus' detriment, allowing the financial harm to persist.

14. <u>Federal Laws, Rules & Guidance re: AML, Suspicious Transactions & Theft</u>

The conduct in this case that is considered elder financial exploitation is also deemed suspicious activity for which financial institutions are required to complete "Suspicious Activity Reports" ("SARs") to the Financial Crimes Enforcement Network (FinCEN) and that may violate anti-money laundering rules under the Patriot Act, Gramm-Leach-Bliley Act (GLBA). Financial institutions "shall establish appropriate, specific, and, where necessary, enhanced, due diligence policies, procedures, and controls that are reasonably designed to detect and report instances of money laundering through those accounts." Section 312(a) (i) (1) of the USA PATRIOT Act, Public Law 107-56. GLBA has specific exemptions allowing financial institutions to report nonpublic personal information to third parties, such as state Adult Protective Services or law enforcement in order to "protect against or prevent actual or potential fraud, unauthorized transactions, claims or other liability," "comply with Federal, State, or local laws, rules, and other applicable legal requirements," or "comply with a properly authorized civil, criminal, or regulatory investigation, or subpoena or summons by federal, state or local authorities." See 15 U.S.C. 6802(e)(3)(B), and (e)(8).

All financial institutions are **required** to **know their customers**, **including** every person with a power of attorney. FINRA Rule 2090. Know Your Customer **("**Every member shall use reasonable diligence, in regard to the opening and maintenance of every account, to know (and retain) the essential facts concerning every customer and concerning the authority of each person acting on behalf of such customer.")

All brokerage firms are also **required** to **know every transaction** per FINRA Rule 3110/3120; FINRA Rule 3110(b)(2) and requires a firm to have supervisory procedures for the review by a registered principal, evidenced in writing, of all transactions relating to the firm's investment banking or securities business. A firm holding and managing the transaction of securities cannot become a facilitator for fraud.

Respondents failed to heed SEC and FINRA carrying/custodial, anti-money laundering and identity theft laws, rules, guidelines and notices that would have stopped this conduct in its tracks. FINRA's rules include, but

are not limited to FINRA's Rule 3120 (Supervisory Controls), Rule 3310 (Anti-Money Laundering[60]) and Rule 2340 (Customer Account Statements).

Respondents also failed to heed important FINRA Industry Guidelines, such as Regulatory Notices 09-64 (Customer Assets Verification of Instructions to Transmit or Withdraw Assets from Customer Accounts), 08-69 (Fair and Accurate Credit Transactions Act of 2003), 12-05 (Customer Account Protection) and 10-19 (Consolidated Reports). These rules apply to both introducing brokers as well as clearing firms and platforms for investment advisors, such as Schwab.

## P.  **BREACH OF IMPLIED & ACTUAL CONTRACT**

(All Respondents)

Respondents also breached their implied and actual contracts with Ms. Kraus by violating other Federal statutes, FINRA Rules and both Florida and New York state laws cited herein. In transacting business with Ms. Kraus, Respondents agreed, contracted, and undertook expressly and/or impliedly:

1. To observe faithfully the statutes, laws, rules and regulations of the federal and state authorities and of the self-regulatory organizations and markets of which they are members;
2. To deal with the Claimants fairly and honestly and in complete good faith;
3. To act in the best interest of the Claimants;
4. To render truthful, accurate, complete, and honest services and statements and not to mislead the Claimants; and
5.  To keep and carefully maintain the Claimants' funds and properties, including protecting assets by knowing the customer, monitoring the Claimants' account for red flags and suspicious activity that could compromise their account security, verifying changes to account information by notifying and checking with the Claimants

---

[60] FINRA Rule 3310 (AML Requirements):

(f) Include appropriate risk-based procedures for conducting ongoing customer due diligence, to include, but not be limited to:

(i) Understanding the **nature and purpose of customer relationships** for the purpose of developing a customer risk profile; and

(ii) Conducting ongoing monitoring to identify and report suspicious transactions and, on a risk basis, to maintain and **update customer information**. For purposes of paragraph (f)(ii), customer information shall include information regarding the beneficial owners of legal entity customers (as defined in 31 CFR 1010.230(e)).

The legal elements for establishing a breach of contract are satisfied if the plaintiff can prove (1) that a contract exists, (2) the breach of that contract, and (3) damages resulting from that breach. *Farman v. Deutsche Bank National Trust*, 311 So.3d 191, (2d District Ct of Appeal FL).

Respondents are explicit parties to Ms. Kraus' financial relationship described herein through the Investment Advisory Agreement with Francis Financial, the account applications with Schwab, and Schwab's Power of Attorney agreement which granted Mr. Graham full Power of Attorney over Ms. Kraus' account. JPM's decades-long relationship with Ms. Kraus, which during the relevant time period was with the Private Bank that included a registered person, had similar internal compliance and supervisory procedures. JPM was responsible under the same AML, Banking and state laws via their similar agreements with Ms. Kraus and it with the other Respondent firms violated these agreements through their breach of the industry rules and laws cited herein.

Damages are an essential element of a breach of contract action in Florida. In *Farman*, the plaintiffs had no evidence to prove damages because they were speculative.[61] Whereas in Ms. Kraus' case, her monthly account statements are proof that at least $8.4 million was stolen from her through fraudulent withdrawals, ratified by the Respondents.

1. <u>Know Your Customer Violations</u>

Financial institutions have an obligation to protect investors not just at account opening, but throughout the life of the account. FINRA Rule 2090, otherwise known as the "Know Your Customer" rule, requires that every firm "shall use reasonable diligence, in regard to the opening **and maintenance** of every account, to know (and retain) the essential facts concerning every customer and concerning the authority of each person acting on behalf of such customer." *See* FINRA Rule 2090 (emphasis added).

Pursuant to Regulatory Notice 14-10 from March 2014, FINRA's guidance to member firms is explicit that this continuing obligation to maintain the investor's account is not limited to just a customer's account objectives and risk tolerances, but also the customer's personal account and contact information:

> Similarly, with respect to changes of customer account information, a firm must have procedures to monitor all changes of customer account information and not only

---

[61] *Id.*

address and investment objective changes.   Examples of other changes to customer account information would include, without limitation, changes to a customer's name, marital status, telephone, email or other contact information.[62]

Respondents violated FINRA Rule 2090 because they failed to know their customer and use reasonable diligence in the maintenance of Claimant's accounts. The Investment Advisers Act of 1940 also has these requirements.  In fact, Respondents exercised no diligence at all.  The firms and Ms. Francis also failed to act with respect to the irregular and suspicious account transactions, which occurred so close in time to the changes in Ms. Kraus's control of the account.

## Q. **BREACH OF FIDUCIARY DUTY**

(Respondents Stacy Francis and Francis Financial)

Mr. Graham was a fiduciary to his mother by virtue of the power of attorney that was executed.  Ms. Francis and Francis Financial were also fiduciaries under the Investment Advisor Act of 1940 and relevant state investment advisor statutes in New York and Florida.

In citing the seminal U.S. Supreme Court case, *SEC v. Capital Gains Research Bureau, Inc.*, the U.S. Securities and Exchange Commission ("SEC") has repeatedly stated its position that investment advisers are fiduciaries and must be held to the highest standard of conduct under the law:

> An investment adviser is a fiduciary, and as such is held to the highest standard of conduct and must act in the best interest of its client. Its fiduciary obligation, which includes an affirmative duty of utmost good faith and full and fair disclosure of all material facts, is established under federal law and is important to the Commission's investor protection efforts.

Securities and Exchange Commission, 17 CFR Part 275, Release No. IA-4889, *citing SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 194 (1963).

In *Capital Gains*, the U.S. Supreme Court was unequivocal in conferring a fiduciary standard in investment advisers because:

> The Investment Advisers Act of 1940, 15 U.S.C.S. § 80b-1 et seq., reflects a congressional recognition of the delicate fiduciary nature of an investment advisory relationship, as well as congressional intent to eliminate, or at least to expose, all

---

[62]  FINRA Regulatory Notice 14-10 – Consolidated Supervision Rules – SEC Approves New Supervision Rules, at: http://www.finra.org/sites/default/files/NoticeDocument/p465940.pdf, p. 10.

> conflicts of interest which might incline an investment adviser, consciously or unconsciously, to render advice which was not disinterested….Courts have imposed on a fiduciary an affirmative duty of good faith, and full and fair disclosure of all material facts as well as an affirmative obligation to employ reasonable care to avoid misleading his clients.

*Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 181 (1963).[63]

Importantly, the Court additionally held that, in reviewing the application of common law principles to the Investment Advisers Act of 1940, "Congress, in empowering the courts to enjoin any practice which operates 'as a fraud or deceit' upon a client, did not intend to require proof of intent to injure and actual injury to the client. Congress intended the Investment Advisers Act of 1940 to be construed like other securities legislation 'enacted for the purpose of avoiding frauds,' not technically and restrictively, but flexibly to effectuate its remedial purpose." *Id.* At 195.

The Investment Advisers Act of 1940's anti-fraud provisions are in Section 206 and prohibit investment advisers from engaging in fraudulent, deceptive, or manipulative conduct. These provisions include:

- Full disclosure: Advisers must fully and fairly disclose all material facts to clients.
- Avoiding misleading clients: Advisers must avoid misleading clients.
- Refraining from fraud: Advisers must refrain from fraudulent conduct.
- Not misappropriating assets: Advisers must not misappropriate a client's assets or property.
- Disclosing conflicts of interest: Advisers must disclose any conflicts of interest that could impact a client's decision, such as if they will receive compensation for promoting a product.

The anti-fraud provisions in Section 206 are broader than Section 10(b) of the Securities Exchange Act of 1940, which is limited to fraud in connection with the purchase or sale of a security.

Registered investment advisors in New York like Francis Financial have a registration process at a threshold that was obviously met in its case. The registration process includes:

- Financial statement requirements, such as a balance sheet and income statement
- Licensing requirements, such as passing the Series 65, Series 66, and Series 7 exams, or holding a qualifying professional designation with all the laws and rules that accompany these licenses.

NY Gen Bus L § 359-EEE.

---

[63] *See also Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 17 (1979) ("§ 206 [of the Investment Advisers Act of 1940] establishes federal fiduciary standards to govern the conduct of investment advisers.")

Registered investment advisors working with clients in Florida have similar requirements, as detailed above in Section 517 of the Florida Investor Protections Act, *supra*.

### R. AID & ABET BREACH OF FIDUCIARY DUTY, FRAUD & CONVERSION: FAILURE TO ACT
(All Respondents)

Mr. Graham was a fiduciary to his mother by virtue of the power of attorney that was executed. Ms. Francis and Francis Financial were also fiduciaries under the Investment Advisor Act of 1940 and relevant state investment advisor statutes in New York and Florida. Mr. Graham not only breached his fiduciary duties, but engaged in fraud and conversion.

In both New York and Florida, it is well established that individuals holding a POA are considered fiduciaries under the law. Specifically, in New York, "A power of attorney creates a fiduciary relationship between principal and agent" *Matter of Gershenoff*, 2003 NY Slip Op 23956, 2 Misc. 3d 847, 849, 774 N.Y.S.2d 644, 646 (Sup. Ct.) (*Matter of Roth*, 283 A.D.2d 504, 724 N.Y.S.2d 476 [2d Dept 2001]; *Mantella v. Mantella*, 268 A.D.2d 852, 701 N.Y.S.2d 715 [3d Dept 2000]; *Matter of Kent*, 188 Misc. 2d 509, 729 N.Y.S.2d 352 [Sup Ct, Dutchess County 2001]). Also codified in New York state, "An agent acting under a power of attorney has a fiduciary relationship with the principal." GOB § 5-1505(2). Similarly, "Florida law states that an attorney-in-fact must exercise the powers conferred as a fiduciary." *Siegel v. JP Morgan Chase Bank*, 71 So. 3d 935, 944 (Fla. Dist. Ct. App. 2011). *See also In re Estate of Schriver*, 441 So. 2d 1105 (Fla. 5th DCA 1983); § 709.08(8), Fla. Stat. (2011). Also codified in Florida state, "An agent is a fiduciary. Notwithstanding the provisions in the power of attorney, an agent who has accepted appointment: Must act only within the scope of authority granted in the power of attorney…" § 709.2114(1)(a).

To aid and abet a conversion, in both Florida and New York, the standard is (1) a conversion by the primary wrongdoer; (2) knowledge of the underlying conversion by the alleged aider and abetter; and (3) substantial assistance in committing the wrongdoing. *Lawrence v. Bank of Am., N.A.*, 455 Fed. Appx. 904, 906 (11th Cir. 2012) (applying Florida law); *Torrance Constr., Inc. v. Jaques*, 2015 NY Slip Op 02813, ¶ 2, 127 A.D.3d 1261, 1263, 8 N.Y.S.3d 441, 444 (App. Div. 3rd Dept.).

Where, as here, it is alleged that financial institutions and professionals were "aware that investor funds were being chronically sapped from fiduciary accounts and placed into other accounts for purposes that the defendant bank—allegedly—knew were not what the investors intended, the bank acquires knowledge of a breach of a fiduciary duty, and must attempt to prevent the diversion." *Yao-Yi v. Wilmington Tr. Co.*, 301 F. Supp. 3d 403, 420-21 (W.D.N.Y. 2017).    "Substantial [**8] assistance occurs when a defendant affirmatively assists,  helps conceal, or fails to act when required to do so, thereby enabling the breach to occur." *Chang v. JP Morgan Chase Bank, N.A.*, 845 F. 3d 1087, 1098 (11th Cir. 2017) (quoting *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 295 (2d Cir. 2006)). A financial institution can be considered to provide substantial assistance to advance the commission of the fraud.  "Substantial assistance occurs when a defendant affirmatively assists, helps conceal ***or fails to act when required to do so***, thereby enabling the breach to occur." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 295 (2d Cir. 2006) (internal quotation marks omitted)(emphasis added); *see generally Hubbard v. Hollywood Park Realty Enters., Inc.*, No. CIV. A. 11779, 1991 Del. Ch. LEXIS 9, 1991 WL 3151, at *10 (Del. Ch. Jan. 14, 1991) ("From a semantic and even legal viewpoint, "inaction" and "action" may [**46] be substantive equivalents, different only in form."). *Yao-Yi v. Wilmington Tr. Co.*, 301 F. Supp. 3d 403, 426 (W.D.N.Y. 2017).

Here, the financial institutions knew that through December 2020, Mr. Graham had no valid power of attorney or authorization to withdraw and transfer $2,525,000, but aided him in converting that money to his own use notwithstanding.  Respondents not only had a duty to insure that a person transacting on the account had proper authority but always had a duty under the elder financial exploitation statute in Florida while Mr. Graham was living in Florida (July 2020) to report it to a trusted contact person and/or the state.  $6,852,000 was withdrawn and transferred in a pattern clearly suggesting elder financial exploitation, between July 2020 through December 2023.

 "Substantial assistance requires the plaintiff to allege that the actions of the aider/abettor proximately caused the harm on which the primary liability is predicated." *Cromer Finance Ltd. v. Berger*, 137 F. Supp. 2d 452, 470 (S.D.N.Y. 2001), *accord Neilson v. Union Bank of Cal., N.A.*, 290 F. Supp. 2d 1101, 1129 (C.D. Cal. 2003). *Gilison v. Flagler Bank*, 303 So. 3d 999, 1003-04 (Fla. Dist. Ct. App. 2020).

When the fraud was discovered, Ms. Kraus' daughter was given power of attorney to replace Mr. Graham, and he was reported to the police..  Had an early report been made, as they were duty bound under the law to Ms. Kraus, the harm she suffered would not have occurred.

## IX.    DAMAGES
### A.  COMPENSATORY & STATUTORY  DAMAGES

Claimant seeks the following compensatory damages:  $8,427,000 including well managed account damages shown in the chart below. Had Ms. Kraus' accounts been properly invested she would have earned approximately $612,484 but did not, for a total compensatory loss of **$9,039,484**.



**B. PUNITIVE DAMAGES**

It is well-recognized that an arbitration panel has the power and discretion to award punitive damages. The FINRA Dispute Resolution Arbitrator's Guide provides on page 51 that "arbitrators may consider punitive damages as a remedy if a respondent has engaged in serious misconduct that meets the standards for such an award." The United States Supreme Court recognized an Arbitration Panel's right to award punitive damages in an investor arbitration like this one. *See Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52 (1995).

By reason of Respondents' actions and inactions and as supported by the U.S. Supreme Court, Ms. Kraus is entitled to recover punitive damages as a result of Respondents' breach of duties and failure to supervise.

**C. ATTORNEYS FEES ARE APPROPRIATE**

1. Florida Statute

Respondents supervised and managed accounts for Ms. Kraus, while her durable POA, Mr. Graham, resided in the state of Florida. Accordingly, Respondents' liability to Ms. Kraus falls under Florida's antifraud statute, which applies "[w]ith respect to any customer, transaction or business in, to or from this state." Remedies under this statute are provided under Section 517.211, which specifically entitles the Ms. Kraus to reasonable attorneys' fees for any violations by Respondents under Section 517.301 of the Florida Investor Protection Act. "In any action brought under this section, including an appeal, the court shall award reasonable attorneys' fees to the prevailing party unless the court finds that the award of such fees would be unjust." Florida Statutes 517.211(6).

2. New York

Ms. Francis' and Francis Financial's contract also has a fee shifting provision, which contemplates attorneys fees may be awarded to the prevailing party of any arbitration between the parties. It also specifies New York Law.

It is well recognized that an arbitrator has the authority to grant legal fees. *See, e.g., Synergy Gas Co. v. Sasso*, 853 F.2d 59 (2nd Cir.), *cert. denied*, 488 U.S. 994 (1988). In addition, it has been consistently held that where the Uniform Submission Agreements of each of the parties incorporate the Claimant's Statement of Claim,

if the Statement of Claim requests attorney's fees, it constitutes the agreement of the parties to empower the arbitrators to decide the issue of attorneys' fees. *See, e.g., First Interregional Equity Corp. v. Haughton*, 842 F.Supp. 105 (S.D.N.Y. 1994) and *U.S. Offshore, Ltd. v. Seabulk Offshore, Ltd.*, 753 F.Supp. 86 (S.D.N.Y. 1990); *see also* a case handled by Malecki Law, through the Court of Appeals of the State of New York on this very issue, in which attorneys' fees were awarded by an arbitration panel and upheld. *Robert Ferrucci v. McLaughlin, Piven, Vogel Securities, Inc., and Laurence T. Tulenko*, 889 N.Y.S.2d 134 (C.A. N.Y. 2006).

The Court of Appeals of New York has also repeatedly held that Plaintiffs are entitled to recover attorneys' fees after sufficiently alleging consumer-oriented misconduct under New York General Business Law §349. *See, e.g., Oswego Laborers' Local 214 Pension Fund v Marine Midland Bank,* 85 N.Y.2d 20, 24-27 (New York Court of Appeals 1995); *Gaidon v Guardian Life Ins. Co.*, 94 N.Y.2d 330, 344-345 (1999); *New York Univ. v. Continental Ins. Co.*, 87 N.Y.2d 308, 320 (1995). Given the statute's explicit prohibition of "deceptive acts or practices…in the furnishing of any service" (General Business Law § 349 [a]), and given the Court of Appeals' characterization of the statute as "applying to virtually all economic activity." *Small v. Lorillard Tobacco Co.*, 94 N.Y.2d 43, 55 (1999), there is no basis for invoking any blanket exception under the statute for securities transactions (*see Breakwaters Townhomes Assn. of Buffalo v. Breakwaters of Buffalo*, 207 A.D.2d 963, 616 (1994)) or for limiting the statute's applicability to the sale of "goods." *See Scalp and Blade v. Advest et al.*, 281 A.D.2d 882, 883 (4th Dept 2001).

In calculating the amount of the attorney's fees award, the Panel may simply award a percent of the amount recovered, which in New York is typically 33.33% in tort cases, such as this. It is not necessary for counsel to submit a statement setting forth the hours spent and rate of compensation. *See Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 50 (2nd Cir. 2000).

## D. <u>INTEREST IS APPROPRIATE</u>

1. <u>Florida Law</u>

Claimant should be awarded statutory interest in connection with her damages and in accordance with Florida Statute 55.03 (Judgements; rate of interest, generally). Florida Statute Section 517.211, specifically instructs that

statutory interest should be factored into an award of damages "at the legal rate from date of purchase."  Fla. Stat. 517.211 (4)(a).

2.  <u>New York Law</u>

Ms. Kraus should be awarded a fair rate of interest at the legal rate of 9% compounded. C.P.L.R. §§5001-5004.  Money verdicts, breach of contract, interference w/possession or enjoyment of property, include interest at legal rate from the date that the cause of action first existed or date the damage was incurred.  *Id.*

This case is no different from the types of cases in which interest is awarded in the state "in which pre-verdict interest has been held to be recoverable as a matter of right."  *DeLong Corp. v. Morrison-Knudsen Coo.*, 14 N.Y.2d 346, 348 (C.A.N.Y. 1964).

**E.  <u>FORUM COSTS AND EXPERT WITNESS FEES</u>**

Ms. Kraus should not be liable for forum fees and costs, instead, the cost of Respondents' wrongdoing should be borne by them alone.  The submission of these claims to FINRA Dispute Resolution, as they are contractually obligated to do, did not contain disclosure of the costs and fees at the time they were executed.

**F.  <u>DISCIPLINARY REFERRAL</u>**

By reason of the egregious conduct herein, Ms. Kraus requests that a disciplinary referral be made of this matter at the close of the hearing against Respondents, particularly Ms. Francis, Francis Financial and Schwab for the reasons stated above.

**WHEREFORE**, as a direct and proximate result of the foregoing conduct of Respondents, Ms. Kraus was injured and seeks compensatory and statutory damages in the amount of not less than **$9,039,484**, treble damages, plus interest, costs, punitive damages, and attorneys' fees.

There should also be  disciplinary referral for Schwab's use of indemnification clauses in violation of FINRA Rules 2268 and 2010, in an attempt to pre-indemnify itself in customer agreements for its failing to engage in mandatory reporting, as well as Ms. Francis and Francis Financial for the serious breach of fiduciary duty.

Dated:     New York, New York          Respectfully submitted,
           September 26, 2024

**MALECKI LAW**

*Jenice L. Malecki*
_____
Jenice L. Malecki, Esq.
Jacqueline N. Candella, Esq.
Adam G. Schreck, Esq.
***Attorney for Susan Kraus***
11 Broadway, Suite 715
New York, New York 10004
(212) 943-1233
Jenice@MaleckiLaw.com
Jacqueline@MaleckiLaw.com
Adam@MaleckiLaw.com
**www.AboutSecuritiesLaw.com**